Cameron M. Hancock (UT Bar No. 5389)
Christopher S. Hill (UT Bar No. 9931)
Hilary R. Adkins (UT Bar No. 18296)
**KIRTON McCONKIE**
50 East South Temple, Suite 400
Salt Lake City, UT 84111
Telephone (801) 328-3600
Facsimile: (801) 321-4893
chancock@kmclaw.com
chill@kmclaw.com
hadkins@kmclaw.com

*Attorneys for Plaintiff RJ&CS SC Holdings, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RJ&CS SC Holdings, LLC, a Utah limited company,<br><br>    Plaintiff,<br><br>v.<br><br>Dr. Randy E. Woodward DC, PC, a Utah professional corporation, and Randy E. Woodward, an individual,<br><br>    Defendants. | **COMPLAINT**<br><br>Case No. 2:23-cv-00127<br><br>Judge _____<br><br>**JURY TRIAL DEMANDED** |

Plaintiff RJ&CS SC Holdings, LLC ("RJ&CS" or "Plaintiff"), by and through its undersigned counsel of record, hereby complains against Defendants Dr. Randy E. Woodward, PC ("Woodward") and Randy E. Woodward ("Randy") (collectively, the "Defendants"), as follows:

<u>**PARTIES**</u>

1.      Plaintiff RJ&CS SC Holdings, LLC, is a Utah limited company with its principal place of business in Salt Lake County, Utah.

2.      Defendant Dr. Randy E. Woodward DC, PC, is a Utah professional corporation with its principal place of business in Salt Lake County, Utah.

3.      Defendant Randy E. Woodward is an individual that resides in Salt Lake County, Utah.

<u>**JURISDICTION AND VENUE**</u>

4.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 as several of the claims arise under the laws of the United States.  Specifically, this Court has federal question jurisdiction pursuant to 15 U.S.C. § 78(j) and SEC Rule 10(b)-5.

5.      This Court also has supplemental or pendant subject matter jurisdiction over Plaintiff's state and common law claims under the state law claims under 28 U.S.C. § 1367(a) because those claims arise from the common nucleus of operative facts alleged in Plaintiff's federal claim.

6.      This Court has personal jurisdiction over Defendants under the principles of specific and general jurisdiction, as all Defendants reside in Utah and the facts giving rise to this action occurred in Utah.

7 .      Venue is also proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims herein occurred in this district.

4881-4239-3158.v5

## FACTUAL BACKGROUND

8.     This case involves securities fraud orchestrated by Defendant Woodward, part-owner, in Integrated Holding Company, LLC (the "Company"). This fraud occurred when Woodward made misrepresentations and omissions of material fact in connection with the sale of its interests in a limited liability company.

9.     The Company owns all of the membership interests in and of Utah Intermountain Anesthesia, LLC, Integrated Wellness Utah, LLC, Utah Intermountain Pain Management, LLC, and Utah Intermountain Surgical Center, LLC (collectively, the "Subsidiaries").

10.     Woodward owned fifty percent (50%) of the issued and outstanding LLC membership interests in the Company (the "Interests"), and Randy is the director of Woodward.

11.     As alleged in further detail below, Defendants induced Plaintiff to purchase its Interest in the Company.

12.     As a result of these inducements, Plaintiff purchased Woodward's Interests in the Company for approximately $5,758,154.00, some of which paid by promissory note.

13.     The purchase of an interest in a limited liability company is specifically defined as a security under Utah state law, which also qualifies as an investment contract under federal law.

14.     A note is also specifically defined under Utah state law and federal law as a security.

15.     In early 2021, Defendants reached out to Plaintiff about purchasing its Interests in the Company.

16.     According to representations made by Defendants, to Plaintiff, the Company was an extremely profitable health and wellness and pain management provider with no clear issues.

4881-4239-3158.v5

17.     In February 2021, Woodward, as an equal partner in the Company, through Randy had several conversations over email with Plaintiff regarding a suitable agreement for Plaintiff to purchase its Interests in the Company. *See generally*, Intro Offer email chain, attached hereto as **Exhibit A**.

18.     As part of the information shared by Defendants to induce Plaintiff to purchase its Interests in the Company, Defendants provided to Plaintiff a summary of performance and expectations, attached hereto as **Exhibit B**.

19.     Defendants explained to Plaintiff that the owners of the Company would collect around $2 million annually.[1] *Id.* at 3.

20.     On top of the profitability, Defendants clearly represented to Plaintiff that owning the Company was "mailbox money" where the Subsidiaries ran themselves, and the owners sit back and get paid. *See id*; *see also* **Exhibit C** attached hereto.

21.     No issues were disclosed by Defendants pertaining to the Company, besides noting that collection history for the surgical center is 13 months long and the uncertainty with insurance companies. Ex. B at 3.

22.     In the email pitches to Plaintiff, Defendants made misrepresentations and omissions of material fact in connection with the offer and/or sale of securities.

23.     Specifically, Defendants misrepresented to Plaintiff that:

a.   Actual revenue to be collected was over $2 million.

---

[1] The prior year's annual revenue was around $2,013,144. Ex. B at 5.

b.  An in-process switch of billing companies will make a drastic decrease to overhead or increase to profits, increasing take home by a significant amount.

c.  Ownership in the Company means you can function as "semi-retired" and "the day-to-day operations do not rely on [the owners]." "Seller is not the face of the practice and hasn't treated patients for over 4 years." Thus, owners can "accomplish these numbers without actually working in the clinic at all or seeing patients."

d.  "Center is in a high growth cycle, which increases business sale multiple."

e.  "[C]ollections are just beginning to ramp up, allowing profit to increase."

*See* Ex. A at 2; Ex. B at 3; Ex. C.

24.    Further, Defendants made representations throughout its communications with Plaintiff by using words including "expected," "anticipated" collection and profit, "we expect," "that amount would be," "my half is," and "likely to collect." *See* Ex. B.

25.    Based on these favorable representations, Plaintiff in good faith agreed to buy Woodward's Interests in the Company.

26.    On May 4, 2021, Woodward and Plaintiff entered into a Membership Interest Purchase Agreement (the "Agreement") where Plaintiff purchased Woodward's Interests for an aggregate amount of $5,758,154.00. *See* Membership Interest Purchase Agreement, attached hereto as **Exhibit D**.

27.    Plaintiff paid the initial closing payment of $1 million to Woodward at the Closing on May 1, 2021. *Id.*

28.     The rest of the purchase price was to be paid overtime by execution of a Secured Promissory Note and secured by the Membership Pledge Agreement. *Id.*

29.     Once Plaintiff took over Woodward's Interest in the Company, Plaintiff discovered Defendants misrepresented and failed to disclose material facts.

30.     Defendants failed to disclose to Plaintiff the following facts before signing the Agreement:

    a.   The actual amount of involvement and work ownership in the Company requires.

    b.   One client account for approximately $800,000 accounted for a significant portion of the annual revenue Defendants presented to Plaintiff.

    c.   The $800,000 client account switched insurance companies so payout will be less.

31.     These myriad of misrepresentations and omissions were material to the Plaintiff's decision to purchase Woodward's Interests.

32.     Plaintiff would never have purchased Woodward's Interests had Plaintiff known the truth of these factual misrepresentations and omissions.

33.     Defendants knew or should have known that the billing company for the surgical center was committing fraud when its return amounts were above industry standard before entering into the Agreement.

34.     Defendants knew or should have known that Blue Cross and Blue Shield would not pay because it was aware of the billing company's potential fraud.

4881-4239-3158.v5

35.     Defendants represented that the Plaintiff would collect $2,758,154, after expenses, *see* Ex. B at 5, in addition to the annual revenue, however Plaintiff has only collected around $750,000.

36.     Additionally, while Defendants disclosed the Company's profits and losses, it failed to specify that a large portion of profits, approximately $800,000, came from one client account.

37.     Plaintiff would not have paid the purchase price if they would have known one client account accounted for a significant portion of the annual revenue to be collected because it would have been aware that amount would not be replicated.

38.     Upon information and belief, Defendants were aware that the one client account eventually changed insurance providers, which did not pay out to providers as well as before – a huge loss for the Company.

39.     Upon information and belief, two to three months after finding the one client account that generated $800,000 was switching insurance providers Woodward reached out to Plaintiff to sell its Interests and did not disclose these issues.

40.     Defendants benefited substantially from Plaintiff purchasing its Interests.

41.     The myriad of misrepresentations and omissions were material to Plaintiff's to purchase Woodward's Interests.

42.     Plaintiff would not have purchased Woodward's Interests had it known the truth of these factual misrepresentations and omissions.

43.     This suit seeks to recover Plaintiff's payments, and cancel any future payments, along with interest, attorneys' fees, court costs, punitive damages, and treble damages consistent with Defendants' egregious, systematic, and willful misconduct.

**FIRST CAUSE OF ACTION**
**Federal Securities Fraud—15 U.S.C. § 78(j), 17 C.F.R. § 240.10b-5**
**Against Woodward**

44.     Plaintiff incorporates the foregoing paragraphs as if restated in their entirety.

45.     The investment contract (i.e., the interest in the limited liability company) and ownership promissory note Woodward sold to Plaintiff constitute "securities" within the meaning 15 U.S.C. § 77b.

46.     Woodward, by engaging in the conduct described above, directly or indirectly with scienter: (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated or would operate as fraud and deceit upon other persons.

47.     Plaintiff justifiably and reasonably relied upon Woodward's representations that all relevant information regarding the securities had been provided to Plaintiff that all accounting information of the Company was accurate.

48.     Plaintiff would not have purchased Woodward's Interests in the Company had all relevant information been disclosed to Plaintiff regarding the securities.

49.     Woodward used instrumentalities of interstate commerce in connection with convincing Plaintiff to participate in the Agreement.

4881-4239-3158.v5

50.     Woodward contacted Plaintiff by email and telephone to discuss the purchase of securities.

51.     Woodward knowingly or recklessly made the foregoing misrepresentations and omissions, knowing that Plaintiff was relying upon the same to purchase Interests in the Company.

52.     Woodward owed a duty to avoid omitting or not disclosing material facts necessary for Plaintiff to know in connection with its purchase.

53.     Plaintiff justifiability relied on these untrue statements of material facts and material omissions by Woodward to purchase Interest in the Company.

54.     Woodward's misrepresentations and omissions caused Plaintiff to suffer damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION
### Employment of A Device, Scheme, or Artifice to Defraud − 15 U.S.C. § 77q(a)(1)
### Against Woodward

55.     Plaintiff incorporates the foregoing paragraphs as if restated in their entirety.

56.     Woodward, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in the interstate commerce or by use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

57.     As a result of the foregoing, Woodward caused Plaintiff to suffer damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## THIRD CAUSE OF ACTION
### Fraud in the Offer and Sale of Securities − 15 U.S.C. § 77q(a)(2) and (3)
### Against Woodward

58.     Plaintiff incorporates the foregoing paragraphs as if restated in their entirety.

59.     Woodward, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in the interstate commerce or by use of the mails, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operate, or would operate as a fraud or deceit upon the purchaser.

60.     As a result of the foregoing, Woodward caused Plaintiff to suffer damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

### FOURTH CAUSE OF ACTION
### State Securities Fraud – Utah Code § 61-1-1 Against Woodward

61.     Plaintiff incorporates the foregoing paragraphs as if restated in their entirety.

62.     This claim is brought pursuant to Utah Code Ann. § 61-1-1.

63.     The securities were issued and sold by Woodward in the State of Utah.

64.     Woodward was a "seller" of the securities for purposes of Utah securities laws, and Plaintiff was a purchaser thereof.

65.     Woodward received funds from the sale of the securities in the State of Utah.

66.     The purchase of an interest in a limited liability company and an ownership promissory note constitutes "securities" within the meaning of Utah Code § 61-1-13.

67.     In connection with Woodward's offer or sale of securities involved with the ownership promissory notes, Plaintiff invested in, and received, a purported limited liability ownership interest in the Company.

4881-4239-3158.v5

68.     In connection with the sale of this purported limited liability ownership interest, Woodward willfully: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff in connection with its purchase of Woodward's Interests in the Company.

69.     As a result of the foregoing, Woodward caused Plaintiff to suffer damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

### FIFTH CAUSE OF ACTION
**Common Law Fraud, Deceit, and Negligent Misrepresentation**
**Against Woodward and Randy**

70.     Plaintiff incorporates the foregoing paragraphs as if restated in their entirety.

71.     Defendants intentionally or recklessly made false representations of material facts or omitted and failed to disclose material facts to Plaintiff necessary to make the representations not misleading.

72.     Defendants shared the Company's profits with Plaintiff before the signing of the Agreement.

73.     However, Defendants omitted to inform Plaintiff that the revenue was coming from only one client account, that one entity's billing company was committing fraud, the annual revenue was not that high, and the level of everyday involvement of the owners in the Company.

74.     Defendants had a duty to Plaintiff prior to and separate from the Agreement to provide truthful information and to not omit material facts related to the securities they sold.

75.     Plaintiff's knowledge was limited to what was represented to it by Defendants, including misrepresentations and material information that was omitted.

76.     Defendants made the above misrepresentations and omissions with the intent of inducing Plaintiff to not investigate the Company's profits and losses, nor to demand an accounting of all revenue.

77.     Each of the representations and omissions was knowingly made with the intent to mislead Plaintiff.

78.     Plaintiff justifiability and reasonably relied upon the Defendants' material misrepresentations and omissions.

79.     Plaintiff would not have purchased Interests in the Company had they known the falsity of the material misrepresentations or omissions.

80.     As a result of the foregoing, Woodward caused Plaintiff to suffer damages in an amount to be determined at trial, plus interest, attorneys' fees, costs and punitive damages.

### SIXTH CAUSE OF ACTION
**Unjust Enrichment Against Woodward**

81.     Plaintiff incorporates the foregoing paragraphs as if restated in their entirety.

82.     Woodward unlawfully received the $1,000,000 payment made by Plaintiff because Plaintiff was induced by fraud, as explained above.

83.     Woodward received the payment and has continued to receive the promissory note payments set forth in the Agreement.

84.     Because the purchase of Woodward's Interests in the Company was induced by fraud, it would be inequitable for Woodward to retain the payment.

85.     As a result of the foregoing, Woodward caused Plaintiff to suffer damages in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## SEVENTH CAUSE OF ACTION
### Recission Against Woodward

86.     Plaintiff incorporates the foregoing paragraphs as if restated in their entirety.

87.     Woodward fraudulently induced Plaintiff, through myriad misrepresentations, to enter into the Agreement to purchase ownership in Company.

88.     There was never a meeting of the minds and mutual consent regarding what was being purchased, i.e., Plaintiff never knew about the billing fraud, the demand of the business, that a significant portion of profits was from only one account, etc.

89.     Thus, the Agreement never became a valid legal document.

90.     Plaintiff would have never entered into the Agreement had they been aware of Woodward's misrepresentations and deceit.

91.     Plaintiff has been damaged by Woodward's fraudulent actions which induced Plaintiff to purchase ownership in the Company in an amount of $1,000,000 plus, value of interest, costs and attorney's fees.

92.     Plaintiff therefore requests that the Court rescind the Agreement for Plaintiff's purchase of Woodward's Interest in the Company and restore the parties to their original positions, including but not limited to the restitution to Plaintiff of the approximately $1,000,000 million paid to Woodward pursuant to the Agreement.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

13

4881-4239-3158.v5

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.      An order restraining and enjoining Woodward from further violations of federal and state securities laws;

b.      Judgment against Defendants on each and every cause of action for rescission of the Agreement, and restoring the parties to their *ex ante* former positions before entering into the Agreement;

c.      Judgment against Defendants for compensatory damages in an amount to be determined at trial plus costs and attorneys' fees;

d.      Judgment against Woodward for treble damages in accordance with federal and state securities laws;

e.      Judgment against Defendants for punitive damages in an amount to be determined at trial;

f.      Pre-judgment and post-judgment interest on all awarded amounts at the maximum rate allowed by law; and

g.      Any other appropriate relief allowed under law and equity.


RESPECTFULLY SUBMITTED this 17th day of February, 2023.

KIRTON McCONKIE


/s/ Cameron M. Hancock
Cameron M. Hancock
Christopher S. Hill
Hilary R. Adkins
*Attorneys for Plaintiff*

14

# Exhibit A

| | |
|---|---|
| **From:** | Cade Archibald |
| **To:** | Regan Archibald |
| **Subject:** | Re: Intro Offer |
| **Date:** | Saturday, February 27, 2021 8:40:42 AM |

Damn! Let's do this!!

We want to make sure we don't do 100% of profits to pay off the remaining 2MM though, otherwise we'll be cash poor for the next year- I think 50% is reasonable or minimum of $60k after 100k profit/take home. - we need to have cash flow for other ventures still (Hawaii, GW, more surgical centers, etc)

I'll work on getting amnioflo rocking in their office, get all providers up to speed on documentation and specifics since we've already had to do a Medicare chart review. The fact that they have imaging and c-arm already is perfect too!

Super stoked on this!

Cade Archibald
Director, East West Health
O: 435-773-7790
C: 435-406-1752

Sent from my iPhone


On Feb 27, 2021, at 8:18 AM, Regan Archibald <acuregan@gmail.com> wrote:


<PastedGraphic-2.pdf>


Regan Archibald, Lac, CSSac, FMP
acueastwest.com, go wellness.com, anodyne pain.com
(801)582-2011
regan@acueastwest.com


Begin forwarded message:

**From:** Randy Woodward <drrandy@thewellgroup.com>
**Subject: Re: Intro Offer**
**Date:** February 27, 2021 at 7:40:48 AM MST
**To:** Regan Archabald <acuregan@gmail.com>

Hey Regan,

It was great talking to you Thursday. I can't help but wonder how come we haven't done more things together over the years living so close. I really enjoy your energy and relate so well to so many of the

ways you think.

Now that we are nearing the end of the month, thought I'd give you a quick rundown on how February ended. We had a near record collection month. Between the 3 SC entities, we collected from insurance, not counting any patient collections, $573,746. We collected in Int Wellness Utah $147,695. So total collected between all entities is $800,020 for February. Our take home out of that is about $500,000 to split between me and Scott.

A few different ways that are about to make a drastic decrease to overhead or increase to profits, keeping more money in our pockets are a few things:

1. We are in the process of switching to a new billing company for the surgical center. Rather than pay the 15% of gross collections we now pay, the new one charges about half that. For this past month, that would amounted to an increase in our take home of about $43,000, a significant amount.
2. We have just over a year left on our contract, which we have to pay Arizona Pain Relief, Dr. Church's group, 10% of our gross surgical center collections. This savings would have amounted to an additional increase in our take-home of $57,374. So those 2 savings alone would have increased our take home by $100,374.
3. As I believe Scott has mentioned to you, we have not billed any amniotic tissue products using the FluidFlow model with medicare. I believe you have been doing that in your clinics. We have so many patients that would easily close on this procedure, which appears to be a huge untapped revenue source, that compliments the surgical center, since we don't currently treat any Medicare patients in the surgical center model.
4. We are not doing any functional medicine in our clinic currently and this is an untapped niche with a patient base that would benefit.
5. Bringing in a physical therapist will allow us to get paid by insurance for much of the PT work we are doing that insurance is not covering,

Per our discussion, below is my offer to sell my 50% of all entities associated with Integrated Wellness. This would include all tenant build outs, negotiated leases, patient database, good will, and equipment (including C-arm and other items we've purchased in surgical center, x-ray systems, computers, decompression tables, lasers, inventory, etc.) We own all equipment outright with no leases or loans.

- $3,000,000 purchase price

- $1,000,000 cash at time of close
- Balance paid out as 50% of your share of profits in all Integrated Wellness entities
- 8% interest on unpaid balance
- Balance due within 3 years

Please let me know if you'd like to proceed and we can move to the next steps.

Regards,

<PastedGraphic-1.tiff>

DR.**RANDY WOODWARD,** DC, CCEP

10376 S. Jordan Gateway
South Jordan, Utah 84095
801.816.0332 OFFICE
801.816.0331 FAX
drrandy@thewellgroup.com
www.southjordanwellness.com

On Feb 18, 2021, at 4:33 PM, Regan Archibald <acuregan@gmail.com> wrote:

Hey man bummer we couldn't shred today-next week.

Here's the preliminary offer that we spoke about on the phone. As you know, my challenge is striking the balance between recouping a substantial investment vs. going to work and getting things built up on my own for the ASC implementation. I appreciate the opportunity to work with you and Scott and see the value that you both have built over the years.

My offer is $1.5mm US dollars (sorry, not crypto-currency) for the sale of 50% ownership in Integrated Wellness and the Surgical Center.
Pay out terms:

$500k to be paid out immediately, and then monthly

payments of 50% of my share of the surgical center profits until $1mm is reached but not longer than 24 months.

If anything looks disagreeable to you, let me know and we can modify as needed. If it looks reasonable, then I can get legal documents drafted and we can begin due diligence.

Best,

Regan Archibald, Lac, CSSac, FMP
acueastwest.com, go wellness.com, anodyne pain.com
(801)582-2011
regan@acueastwest.com

# Exhibit B

- **Utah Intermountain entities:**

  - **2019** – claims received late in Q4 and **billed in Dec.**
    - Total billed: $810,724.00
      - Total collected: $0.00

  - **2020** – covid delays and other variable(s) affected collections throughout 2020
    - Total billed/processed or under appeal: $82,612,461.30
      - Total collected: $3,007,045.82
        - Percentage: **4%**
    - Total billed/**not** yet processed: $38,530,830.00

  - **2021** – numbers below are only for claims received through March 13
    - Total billed/processed or under appeal: $10,484,291.30
      - Total collected: $1,376,922.34
        - Percentage: **13%**
    - Total billed/**not** yet processed: $32,874,287.42
    - Additional approx. $10,000,000 being submitted to ARS for billings for dates after March 13 through end of April not yet billed nor processed, that will be added to "total billed/not yet processed" column once submitted from clinic, bringing it to $42,874,287.

Items expected to increase collection percentage rates are:

1. Passing of most Covid delays. This has pushed a lot of 2020 collections off to be collected in 2021. As such, there is a billing catch up period, which has been demonstrated in higher percentage collection rates in 2021.
2. Recently incorporated patient signed financial policy stating that we require patients to make up front payments toward their deductibles and co-pays Due to this policy having such an impact on increasing insurance payments, ARS as of April 30, 2021, has mandated that we use this form, which prevents insurance companies from avoiding payments arguing that there's no proof patients will make payments toward care. Having not had this in place until the past few weeks, many Blue Cross plans have not made payments, as well as some other major medical plans, which hampered 2020 collection percentages and will push them off into 2021.

Ave collections between years is 8% collection rate.

Total bill/not yet processed and total expected to be billed/not yet processed through April 30, 2021 is $81,405,117. 8% anticipated collection of that amount is **$6,512,409**. 15% of that will be paid to ARS (collection fee) and 10% to APR (consulting fee) leaving $4,884,307 **($2,442,153** seller half) anticipated net profit.

In addition to the collections stated above, of the remaining $93,907,476 "billed/processed or under appeal", much of that is being appealed for denials for not showing a signed patient financial policy requiring patients to make some type of payment toward patient

portion. Since nearly all our patients have a signed financial plan showing up front payments toward care that we can show, we expect many of these appeals to be overturn and paid on. To date, we have not yet submitted any of these ledgers showing patient payments and are just beginning that process. Simply collecting only 3% on these accounts through these appeals and other appeals that ARS performs, that amount would be $2,817,224 minus 25% ARS and APR fees, which is $2,112,918. My half is **$1,408,612** in additional collections after paying all collection and consulting fees.

| AR for IW clinic: | | Likely to collect % | Likely to collect $ |
|---|---|---|---|
| PIP/LOP | $212,491 | 85% | $180,200 |
| Financed Denefits | $394,177 | 50% | $197,088 |
| Insurance after w/offs | $275,221 | 70% | $206,415 |
| Total | $881,889 | | **$583,703** |

There are approx. *$160,000* of prepay remaining for services not yet rendered. Offset this against likely to collect clinic amount.
$583,703 minus $160,000 is *$423,703* likely to collect minus prepay credit.
Sellers 50% is **$211,851**

Below is a chart of net collections/distributions that Scott and Randy have each have taken from all Integrated Wellness entities (Int Well Utah and 3 surgical center entities) and deposited into their personal accounts since surgical center payments began coming in:

| | | |
|---|---|---|
| April '20 | $56,000 | |
| May '20 | $58,000 | |
| June '20 | $39,000 | |
| July '20 | $220,000 | |
| Aug '20 | $250,000 | |
| Sept '20 | $217,000 | |
| Oct '20 | $126,000 | |
| Nov '20 | $0 | *Chose to take no distribution to increase cash reserves for tax deferred plans |
| Dec '20 | $152,000 | |
| Jan '21 | $226,000 | |
| Feb '21 | $0 | *Chose to take no distribution to increase cash reserves for tax deferred plans |
| Mar '21 | $125,000 | |
| April '21 | *$545,706*** | |

May '20-April '21 total seller distributions received **$2,013,114**

*The reason larger distributions were not taken these months is that we Randy and Scott were saving reserves to put into their Captive and Defined Benefit Plan, which they intend to fund this month.

**As of 4/19/21, Randy and Scott have the following amounts in company MACU bank accounts:

| | |
|---|---|
| $133,941 | Int Well Utah checking |
| $50,537 | IWU savings |
| $603,767 | UISC |
| $50,537 | UIPM |
| $74,105 | UIA |
| $179,000 | Checks at clinic ready to deposit today |
| $1,091,413 | Total |
| *$545,706* | My half of total |
| | |
| $1,958,706 | My half of distributions through for 11 2/3 months going back. |
| $54,408 | Expected by April 30. Ave collections every 10 days seller half ($1,958,706/36 10-day periods/yr) |
| **$2,013,114** | Past 12-month distributions seller half ($1,958,706 + $54,408) |

Most businesses sell for 3-5x's net annual profit plus AR with a 5-10% discount off of likely collectable amount. I have offered to sell at just under 1.5 x's trailing past year net annual profit.

Here are a few factors that I believe should have an impact on purchase price:

For the Buyer:

1. Collection history for surgical center is 13 months long.
2. Uncertainty with insurance companies.

For Seller:

1. Clinic has over 20-year history with large patient and data base of nearly 15,000 patients.
2. Many of the higher paying procedures have not yet been brought into the surgical center such as RFAs, as well as other amnio and other procedures that are covered by Medicare, creating further opportunity for growth.
3. Though payment history is only 13 months for surgical center, center reached massive profitability in a relatively short period of time. Taking what was learned in that period of time and adding to it creates another large ability to continue this growth explosion and add 50% increased revenue with the addition of a few of these high paying services. In addition, this model has a several year track record of being very successful with center's consultants well over the 13-month collection history.
4. Center's 3-year consultant contract with APM has only just over a year left on it. At that point, there will be an additional 10% of gross collections being added to bottom line.
5. Seller is not the face of the practice and hasn't treated patients for over 4 years. As such, there is no patient transition that has to take place that risks patients dropping out of care due to new ownership. This is a "systems driven practice" rather than a "personality driven practice".
6. Being that practice is mostly system-based practice, most owner work needing to be done is to grow clinic to new heights as opposed to maintain current cash flow.

7. Buyer is wanting Seller to carry the note and pay over time with no personal guarantee, both of which put seller at risk of ever collecting agreed upon amount.
8. Center is in a high growth cycle, which increases business sale multiple.
9. Haven't added in any value for company equipment assets valued at approx. $200,000-$250,000.

Based on numbers and facts above, it could be argued that purchase price should be as follows:

- 3 x's net annual revenue (**$6,039,342**)
- 90% of likely collectable surgical center AR $2,442,153 + $1,408,612 = *$3,850,765* x .9 = (**$3,465,688**)
- 90% of clinic collectable after prepay credit is *$211,851* (90% is $**190,666**)

    Total: **$9,695,696**

My offer:

- 1.5 x's net annual revenue ($3,019,671). Seller will stick with the **$3,000,000** agreed amount
- Reduce AR likely collectable after expenses to 75% from ($3,850,765 + $211,851 = $3,677,539) down to **$2,758,154**

    Total: **$5,758,154**

Terms:

- $1,250,000 at time of close
- $1,750,000 seller financed amortized over 3 years at 8% interest
- $2,758,154 seller financed at 8% interest paid as 20% of Buyer's gross collections until balance is repaid

# Exhibit C

Integrated Wellness (IW)

History: Frogley Health & Wellness began around 1997 and was later changed to Integrated Wellness around 2005. Approx. 2010, Randy Woodward DC bought in as an equal partner from Scott Frogley to Integrated Wellness in South Jordan. Approx. 2013 we brought in a nurse practitioner and integrated medical with chiropractic.

Around Oct 2019, we leased a surgical center every Saturday to perform pain management injections, with the intention of adding additional procedures such as nerve ablations, manipulation under anesthesia (MUA), amongst other more advanced services. Within the last few months, we began MUA one Saturday morning per month. All of our procedures have proven to be very successful in helping our patients restore their health, decrease their pain, increase their ability to rehab and regain their normal lives and do it in the safest environment possible with the best trained specialists. Most patients that qualify receive their injections in the surgical center and do rehab in our clinic.

Around August 2019, we hired Arizona Pain Relief (APR) as our consultants to teach us and help set up this surgical center model. We signed a 3-year contract to pay them 10% of collections during this period of time. We also engaged a billing company they use that bills only for this model. We pay them approx. 15% of collections. APR has since found a new billing company that does the same thing but charges about half that amount. We plan on switching over to them but have not yet. The surgical center bills out of network for all insurances and does not treat any Medicare or federally or state funded plans. We began billing insurances in early 2020. Due to the lag in billing and collecting from insurances out of network, we were able to start taking home some profits in April 2020, but the real collections began coming through in July 2020.

Much of our overhead for the surgical center was paid out of our clinic account. We began keeping these much more separate in Jan 2021. With that being said, below is the actual take home pay that each Scott and I have taken for those months since the surgical center began its profitability in July 2020. PM=physical medicine/Integrated Wellness clinic. SC=surgical center:

|          | PM   | SC        | Total profit Scott and I EACH took home |
|----------|------|-----------|------------------------------------------|
| July     | 20k  | 200k      | 220k                                     |
| Aug      | 0    | 250k      | 250k                                     |
| Sept     | 17k  | 200k      | 217k                                     |
| Oct      | 26k  | 100k      | 126k                                     |
| Nov      | 0    | 0         | 0                                        |
| Dec      | 15k  | 137k      | 152k                                     |
| Jan      | 42k  | 184k      | 226k                                     |
| Subtotal | 120k | 1,071k    | 1,291,000                                |
| **\*Total** | **140k** | **1,279,000** | **$1,419,000**                   |

\*My half of total profit still left in bank account but not dispersed as of 2/1/21 after paying Jan overhead is $228k. $20k is allocated to PM and $208k to SC.

During past 7 months as collections have begun to come in, we have averaged $203,000 per month for each partner. Annualized this is $2,432,571. At a 3x multiple, this equates to $7,297,714.

Pros/Cons:

Cons:
- SC collection history is fairly short, though the PM history is long.

Pros:
- Though SC collection history is fairly short, this model has a several year history by our consultant company in several other states. It has now proven out in Utah and collections are just beginning to ramp up, allowing profit to increase.
- We started small in SC and are just ramping things up. We still have many more services to bring in, which are more profitable than the services we have so far provided. These services are ready to be added now.
- Partner, Scott Frogley, has partnered with our consultants to bring this model into other states. As such, he is all in, as far as understanding the model, committed and redefining it and making sure it excels with Integrated Wellness. He will be a great fully vested resource/partner to learn from.
- IW is just completing hiring an associate chiropractor that is completing his preceptorship in our clinic and was our rehab manager for a few years prior to attending chiropractic college. He is a very dynamic guy hard working guy. We are opening up another clinic with a surgical center next door to it that will contract a week day that we can lease to double up the model that we are doing with our South Jordan location. This should allow us to double the profitability demonstrated above in a short period of time.
- If the purchaser has clinics already in Utah, he can immediately plug them into this model and exponentially replicate the numbers we have done out of our one clinic with those patients.
- In about a year and a half, our consultant agreement will end and this will create an immediate 10% increased profitability. In addition, switching to the new billing company will create an immediate gross increase to the bottom line of around 7-8%.
- Randy & Scott are each accomplishing these numbers without actually working in the clinic at all or seeing patients. We work part time usually from home in developing and sharpening protocols to create greater growth and profitability. We have been functioning as semi-retired. We take several weeks of vacation each per year without any interruption with the clinics. The day-to-day operations do not rely on us.

Why would Randy sell when so little time is spent with the clinics and profitability is exploding? Randy was the first investor in a software company with his sons. This software company has exploded to become one of Utah's and arguably one of the quickest growth stories to occur. As such, he has decided to spend his time in this exciting venture as well as in retirement. Though the success of the clinics has been immense, the software company is a story beyond our imagination.

# Exhibit D

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

THIS MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "**Agreement**") is made and entered into as of the 4th day of May, 2021 (the "**Effective Date**"), by and among Dr. Randy E. Woodward DC, PC, a Utah professional corporation (the "**Seller**") and RJ&CS SC Holdings, LLC, a Utah limited liability company (the "**Buyer**"), on the other hand.

RECITALS:

WHEREAS, Integrated Holding Company, LLC, a Utah limited liability company (the "**Company**") was formed on or about June 24, 2020 and is in good standing under the laws of the State of Utah. The Company owns all of the membership interests in and of Utah Intermountain Anesthesia, LLC, a Utah limited liability company, Integrated Wellness Utah, LLC, a Utah limited liability company, Utah Intermountain Pain Management, LLC, a Utah limited liability company, and Utah Intermountain Surgical Center, LLC, a Utah limited liability company (collectively, the "**Subsidiaries**");

WHEREAS, Seller presently owns fifty percent (50%) of the issued and outstanding membership interests in the Company (hereafter, the "**Interests**"); and

WHEREAS, the Buyer desires to purchase from the Seller, and the Seller desires to sell to the Buyer, all of the Interests, subject to the terms and conditions described in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements described in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Buyer and the Seller hereby agree as follows:

1.  SALE OF MEMBERSHIP INTERESTS. Subject to the terms and conditions of this Agreement, the Seller agrees to sell to the Buyer, and the Buyer agrees to purchase from the Seller, all of the Interests, which includes any and all rights, privileges and interests in the Company resulting from, associated with or arising from ownership of the Interests as a "Member".

2.  CONSIDERATION. The aggregate purchase price to be paid by the Buyer for the Interests at Closing shall be FIVE MILLION SEVEN HUNDRED AND FIFTY-EIGHT THOUSAND ONE HUNDRED AND FIFTY-FOUR DOLLARS ($5,758,154.00) (the "**Purchase Price**"), which amount shall be paid to the Seller by the Buyer as follows:

2.1   The Buyer shall pay the sum of One Million Dollars ($1,000,000) (the "**Initial Closing Payment**") in cash or certified funds or via wire transfer in immediately available funds to an account designated by the Seller, at the Closing (as hereafter defined); and

2.2   The Buyer shall pay the sum of Two Million Dollars ($2,000,000.00) by execution the Secured Promissory Note in the form attached as Exhibit A-1 hereto and secured by the Membership Interest Pledge Agreement attached as Exhibit B (the "**Security Agreement**").

2.3   The Buyer shall pay the sum of Two Million Seven Hundred and Fifty-eight Thousand One Hundred and Fifty-four Dollars ($2,758,154.00) by execution the Secured Promissory Note in the form attached as Exhibit A-2 hereto and secured by the Security Agreement.

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-45FB-A4D6-F57FEE09CDEB

2.4     Throughout this Agreement, any reference made to the "**Notes**" shall refer to both (a) the Secured Promissory Note in the form attached as <u>Exhibit A-1</u> hereto and (b) the Secured Promissory Note in the form attached as <u>Exhibit A-2</u> hereto.

3.     SELLER'S REPRESENTATIONS AND WARRANTIES. The Seller and the Company, each where indicated, hereby represents and warrants to the Buyer that the following statements are true and correct as of the date of this Agreement and will be true and correct as of the Closing Date (as hereafter defined).

3.1.     <u>Organization</u>.

(a)     The Seller is duly organized, validly existing and in good standing under the laws of the State of Utah, and is duly registered or qualified to do business, and is in good standing in each jurisdiction in which the nature of its business or properties requires such registration or qualification, except where the failure to so register or qualify would have a material adverse effect.

(b)     The Company is duly organized, validly existing and in good standing under the laws of the State of Utah, and is duly registered or qualified to do business, and is in good standing in each jurisdiction in which the nature of its business or properties requires such registration or qualification, except where the failure to so register or qualify would have a material adverse effect.

3.2.     <u>Authority; Capacity</u>. The Seller has full power, authority and capacity to execute and deliver, and to perform its duties and obligations under this Agreement. This Agreement is the legal, valid and binding obligation of the Seller and is enforceable against the Seller in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies, including specific performance, may be subject to the discretion of the court before which any proceeding may be brought.

3.3.     <u>No Conflicts; Consents</u>. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not: (a) violate or conflict with any constitution, statute, regulation, rule, injunction, judgment, order, permit, decree, ruling, charge, or other restriction of any government, governmental agency, court or arbitrator to which either the Seller or any of its assets, or the Company or any of its assets, are subject; (b) conflict with, result in a breach of, constitute a default under (or with notice or the lapse of time or both could result in a breach of or constitute a default), result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice or consent under any agreement, contract, lease, license, instrument, or other arrangement to which the Seller is a party or bound or to which any of its assets are subject; (c) that could result in the creation or imposition of any lien, security interest or encumbrance in, to or on the Interests or any asset of the Seller; or (d) require the Seller to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency, creditor or other third party in order to consummate the transactions contemplated by this Agreement, except as required in the Company's operating agreement.

3.4.     <u>Litigation</u>. Except as set forth in <u>Schedule 3.4</u> of this Agreement, there are no claims, demands, filings, hearings, notices of violation, proceedings, notices or demand letters, investigations, administrative proceedings, civil, criminal or other actions, litigation, suits, mediations,

5/4/2021

arbitrations or other legal proceedings pending or threatened against the Seller or the Company relating to, resulting from or affecting the Interests, related to the medical treatment of any of the Company's patients by the Seller, or that would materially impair the ability of the Seller to perform its duties or obligations under, or to consummate the transactions contemplated by, this Agreement. To the Seller's Knowledge, there are no claims, demands, filings, hearings, notices of violation, proceedings, notices or demand letters, investigations, administrative proceedings, civil, criminal or other actions, litigation, suits, mediations, arbitrations or other legal proceedings pending or threatened against the Company.

3.5.   Title. The Seller is the lawful owner of, and has good and marketable title to, the Interests, free and clear of any and all liens, restrictions, claims, charges, security interests and encumbrances (contractual or otherwise) of any kind, nature or type whatsoever. The Interests have been duly authorized and are validly issued, fully-paid and non-assessable. Upon consummation of the transactions contemplated by this Agreement, the Buyer shall own all of the Interests. The Interests were issued in compliance with applicable laws and were not issued in violation of the Company's Certificate of Organization, Operating Agreement, or any other agreement, arrangement, or commitment to which a Seller or the Company is a party and are not subject to or in violation of any preemptive or similar rights of any party or third party.

3.6.   Title to Property.  To the Seller's Knowledge, (a) the Company has good and marketable title to all of its properties and assets (including any intellectual property such as patents, trade names, trademarks, service marks, copyrights, net names, trade secrets, information, proprietary rights and processes necessary for conduct of the Company) free and clear of any payment obligation to any third party or any other lien or encumbrance except as disclosed in Schedule 3.6; (b) with respect to properties and assets it leases, the Company is in compliance with such leases and holds a valid leasehold interest free of all liens, claims or encumbrances; and (c) the Company is the sole owner of each of the Subsidiaries. The Company is not in default under any lease nor does the Company have Knowledge of any event which, after notice or the passage of time or both, will or may constitute a default under any lease.

3.7.   Labor Matters. To the Seller's Knowledge, (a) there are no disputes, material employee grievances or material disciplinary actions pending or threatened between the Company (or any of the Subsidiaries) and any employees of the Company and (b) the Company (and each of the Subsidiaries) has complied in all respects with all provisions of all laws relating to the employment of labor and has no liability for any arrears of wages or taxes or penalties for failure to comply with any such laws. The Company has no Knowledge of any organizational efforts presently being made or threatened by or on behalf of any labor union with respect to any Company or Subsidiary employees.

3.8.   Taxes. To the Seller's Knowledge, the Company has duly and timely filed all tax returns and reports required to be filed by the Company prior to the date of this Agreement (collectively, the "**Returns**") and each has duly and timely paid all taxes that have been incurred or are due and payable pursuant to such Returns or pursuant to any assessment with respect to taxes in such jurisdictions, whether or not in connection with such Returns. No deficiency or proposed adjustment which has not been settled or otherwise resolved for any amount of tax has been proposed, asserted or assessed by any taxing authority against the Company. To the Seller's Knowledge, there are no actions, suits, taxing authority proceedings, or audits now in progress, pending or threatened against the Company, and there are no liens for taxes (other than for current taxes not yet due and payable) against the Company. The Seller shall be entitled to any refunds or credits against taxes relating to the

Interests for any taxable period (or portion thereof) ending on or prior to the Closing Date. The Buyer shall be entitled to any refunds or credits against taxes relating to the Interests for any taxable period (or portion thereof) beginning after the Closing Date. The parties agree that for any refunds or credits received for any tax periods prior to the Closing Date but which are applied to any Returns following the Closing Date, the Buyer shall pay to the Seller a sum equal to the amounts of refunds or credits so applied.

3.9.   <u>Licenses and Permits</u>. The Company has received all governmental approvals, authorizations, consents, licenses, orders, registrations and permits of all agencies, whether federal, state, local or foreign ("**<u>Permits</u>**") related to the operation of the Company's business. The Company is in compliance with the terms of all Permits, and all Permits are valid and in full force and effect, and no proceeding is pending or threatened, the object of which is to revoke, limit or otherwise affect any Permit. The Company has not received any notifications of any asserted failure to obtain any Permit.

3.10.   <u>Interests</u>. The Seller is the sole owner of the Interests and the Interests represent 50% of the issued and outstanding membership interests of the Company.

3.11.   <u>No Pending Transactions</u>. Except for this Agreement, the Seller is not a party to or bound by any agreement, undertaking or commitment to sell, lease, assign, transfer or exchange any of its portion of the Interests to any other entity or person.

3.12.   <u>Full Disclosure</u>. No representation or warranty of the Seller in this Agreement or any agreement, document or scheduled executed or delivered in connection with this Agreement contains any untrue statement of a material fact or omits to state any material fact which makes any such representation or warranty misleading.

3.13.   <u>Undisclosed Liabilities</u>. The Company has disclosed to the Buyer each of its debts, liabilities, or obligations, whether known or unknown, absolute or contingent, due or to become due, or liquidated or unliquidated, except: (a) liabilities and obligations included or adequately reserved against in the Company's latest balance sheet, (b) those which have been incurred in the ordinary course of business consistent with past Company accounting practice since the latest balance sheet date, and (c) any and all "**<u>Company PPP Loans</u>**" (defined as any loans incurred by the Company under Section 1102 of the Coronavirus Aid, Relief, and Economic Security (CARES) Act, and applicable rules and regulations, as amended from time to time).

3.14.   <u>DISCLAIMER OF ADDITIONAL WARRANTIES</u>. THE BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS SET FORTH IN SECTIONS 3.1 THROUGH 3.13, NEITHER THE SELLER NOR THE COMPANY MAKE ANY REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE COMPANY (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE BUSINESS, THE PHYSICAL CONDITION OF ANY REAL OR PERSONAL PROPERTY COMPRISING A PART OF THE ASSETS OF THE COMPANY, THE VALUE OF THE COMPANY OR ITS ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE COMPANY OR ITS ASSETS, OR ANY OTHER MATTER OR THING RELATING TO THE COMPANY OR ANY PORTION THEREOF). WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS SET FORTH IN SECTIONS 3.1

5/4/2021

THROUGH 3.13, THE SELLER AND THE COMPANY HEREBY DISCLAIM ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO THE COMPANY'S ASSETS OR ANY PORTION THEREOF. THE BUYER FURTHER ACKNOWLEDGES THAT THE BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE BUSINESS, THE COMPANY AND ITS ASSETS AS THE BUYER DEEMS COMMERCIALLY REASONABLE, NECESSARY AND APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF SUCH, THE BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, EXCEPT ONLY FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN SECTIONS 3.1 THROUGH 3.13, THE BUYER WILL ACCEPT THE COMPANY AND ITS ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

3.15.    The term "**Knowledge**" as used throughout this Agreement, or similar words or phrases shall mean the knowledge or awareness of the following individuals only, such knowledge or awareness being deemed to include (a) the actual awareness of a fact or other matter by each such individual and (b) such facts or other matters about which each such individual reasonably should be aware as a result of his involvement with the Company. For the Seller, Randy Woodward, and for the Company, either Randy Woodward or Scott Frogley.

4.    REPRESENTATIONS AND WARRANTIES OF BUYER. The Buyer hereby represents and warrants to the Seller that the following statements are true and correct as of the date of this Agreement and will be true and correct as of the Closing Date.

4.1.    Organization. The Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Utah, and is duly registered or qualified to do business, and is in good standing in each jurisdiction in which the nature of its business or properties requires such registration or qualification, except where the failure to so register or qualify would have a material adverse effect.

4.2.    Authority; Capacity. The Buyer has full power and authority to execute and deliver, and to perform its duties and obligations under, this Agreement. The execution and delivery of, the performance of its obligations under, and the consummation of the transactions contemplated by, this Agreement and any agreement, document, instrument or certificate executed or to be executed in connection with this Agreement, have been duly authorized by all necessary action on the part of the Buyer. This Agreement is the legal, valid and binding obligation of the Buyer and is enforceable against the Buyer in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights generally and except that the availability of equitable remedies, including specific performance, may be subject to the discretion of the court before which any proceeding may be brought.

4.3.    No Conflicts; Consents. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not: (a) violate or conflict with any provision of the organizational documents, as amended, of the Buyer; (b) violate or conflict with any constitution, statute, regulation, rule, injunction, judgment, order, permit, decree, ruling, charge, or other restriction of any government, governmental agency, court or arbitrator to which the Buyer or any of its assets are subject; (c) conflict with, result in a breach of, constitute a default under (or with notice or the lapse of time or both could result in a breach of or constitute a default), result in the

5/4/2021

acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice or consent under any agreement, contract, lease, license, instrument, or other arrangement to which the Buyer is a party or bound or to which any of its assets are subject; (d) result in or require the creation or imposition of any lien, security interest or encumbrance in, to or on any of the properties of the Buyer; or (e) require the Buyer to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any government or governmental agency, creditor or other third party in order to consummate the transactions contemplated by this Agreement.

4.4.    <u>Litigation</u>. There are no claims, demands, filings, hearings, notices of violation, proceedings, notices or demand letters, investigations, administrative proceedings, civil, criminal or other actions, litigation, suits, mediations, arbitrations or other legal proceedings pending or threatened against the Buyer that would materially impair the ability of the Buyer to perform its duties or obligations under, or to consummate the transactions contemplated by, this Agreement.

4.5.    <u>Non-Registration</u>. The Buyer understands that the Interests are being sold to the Buyer under an exemption from registration provided by the Securities Act of 1933, as amended (the "**Act**"), and by applicable state securities acts, and warrants and represents to the Seller that the Interests being acquired by the Buyer are solely for its own account for investment purposes only, and are not being purchased with a view to, or for the resale, distribution, subdivision or fractionalization thereof, and that the Buyer must bear the economics associated with the Interests for an indefinite period of time because the Interests may not be resold or otherwise transferred unless subsequently registered under the Act, or unless an exemption from registration is available.

4.6.    <u>Full Disclosure</u>. No representation or warranty of the Buyer in this Agreement or any agreement, document or scheduled executed or delivered in connection with this Agreement contains any untrue statement of a material fact or omits to state any material fact which makes any such representation or warranty misleading.

4.7.    <u>Conflict Disclosure</u>. The Buyer has been advised that the principal owner of the Seller serves as a manager of the Company while simultaneously owning the Seller, which owns fifty percent (50%) of the issued and outstanding membership interests of the Company.

5.    CLOSING. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall occur on or before May 1, 2021 (the "**Closing Date**") at such time and place as the Buyer and the Seller may agree. The parties agree that the Closing Date shall be effective for accounting purposes as of 12:01 a.m. on the day after the Closing Date unless otherwise agreed in writing by Seller and Buyer.

5.1.    <u>Seller's Deliveries</u>. At the Closing, the Seller shall deliver the following, executed by the Seller as applicable:

(a)    An Assignment of Membership Interest, the form of which is attached hereto as <u>Exhibit C</u>, whereby the Seller assigns and sets over to the Buyer all right, title and interest in and to the Seller's portion of the Interests;

(b)    Any and all certificates or other bearer documentation evidencing the Seller's ownership and interest in and to the Seller's portion of the Interests, duly endorsed and set over to the Buyer as necessary to transfer title thereto;

5/4/2021

(c)     Seller-executed copies of the Notes and the Security Agreement; and

(d)     Such other assignment or conveyance documents or other instruments as may be reasonably requested by the Buyer.

5.2.    <u>Buyer's Deliveries</u>. At the Closing, the Buyer shall deliver the following:

(a)     The Initial Closing Payment, payable in cash or certified funds or via wire transfer in immediately available funds to an account designated by the Seller;

(b)     Buyer-executed copies of the Notes and the Security Agreement; and

(c)     Such other assignment or conveyance documents or other instruments as may be reasonably requested by the Seller.

6.      CLOSING CONDITIONS

6.1.    <u>Conditions to Obligations of Buyer</u>.  The obligation of the Buyer to effect the purchase of the Interests contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties made in this Agreement of the Seller and the Company are true and correct in all material respects as of the Closing Date as if given as of the Closing Date.

(b)     <u>Performance of Covenants</u>. The Seller shall have performed any obligation and complied in all material respects with any agreement or covenant to be performed or complied with by such Seller under this Agreement.

(c)     <u>Material Adverse Consequence</u>.  No condition shall exist and no event shall have occurred that has had a material adverse consequence upon (i) the condition of the Company's business or (ii) the parties' ability to enter into and consummate the transactions contemplated by this Agreement.

(d)     <u>Orders; Injunctions</u>. No preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of any material part of the Company contemplated hereby shall have been issued and remain in effect (each party agreeing to use its commercially reasonable efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall have been enacted by any governmental authority which prohibits the consummation of the sale of the Interests.

6.2.    <u>Conditions to Obligations of Seller</u>.  The obligation of the Seller to effect the sale of the Interests contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following additional conditions:

(a)     <u>Representations and Warranties</u>.  The representations and warranties made in this Agreement of the Buyer are true and correct in all material respects as of the Closing Date as if given as of the Closing Date.

(b)     <u>Performance of Covenants</u>. The Buyer shall have performed any obligation and complied in all material respects with any agreement or covenant to be performed or complied with by the Buyer under this Agreement.

(c)     <u>Orders; Injunctions</u>. No preliminary or permanent injunction or other order or decree by any federal or state court which prevents the consummation of the sale of any material part of the Company contemplated hereby shall have been issued and remain in effect (each party agreeing to use its commercially reasonable efforts to have any such injunction, order or decree lifted) and no statute, rule or regulation shall have been enacted by any governmental authority which prohibits the consummation of the sale of any part of the Interests.

7.     TERMINATION. This Agreement may be terminated by a party upon providing written notice to the other parties at or prior to Closing as follows.

7.1.     <u>Written Consent</u>. By the written consent of the Buyer and the Seller, which termination shall be effective as of the date described in such consent.

7.2.     <u>Misrepresentation or Breach</u>. By the Buyer or the Seller if: (i) any representation or warranty of the other party in this Agreement shall be false, misleading or incorrect in any material respect; or (ii) the other party shall fail to perform any of its duties, obligations or covenants described in this Agreement by or within the required period, which failure to perform is not cured within ten (10) days after the non-defaulting party notifies the defaulting party in writing of such failure to perform.

7.3.     <u>No Closing</u>. By the Buyer in the event the transactions contemplated by this Agreement are not consummated on or before April 30, 2021.

7.4.     <u>Effects of Termination</u>. In the event this Agreement is terminated, the Seller and the Buyer shall have no further rights, duties, obligations or responsibilities described in this Agreement, except for: (i) the respective indemnification rights and obligations of the Seller and the Buyer described in <u>Sections 8 and 9</u> of this Agreement; and (ii) any other right, duty, obligation or responsibility provided for in this Agreement to survive the termination of this Agreement notwithstanding. Notwithstanding the foregoing, in the event that termination of this Agreement occurs as a result of a Party's failure to perform or misrepresentation, the defaulting Party shall be obligated and responsible for any and all costs and expenses (including reasonable attorney's fees) incurred by the non-defaulting Party related to or connected with this Agreement.

8.     INDEMNIFICATION BY SELLER. The Seller hereby covenants and agrees to indemnify, save, defend, hold harmless, discharge, and release the Buyer, its affiliates and their respective stockholders, members, partners, directors, managers, officers, employees, agents, representatives, successors and assigns from and against any and all payments, charges, judgments, assessments, liabilities, obligations, claims, demands, actions, losses, damages, penalties, interest or fines, and any and all costs and expenses paid or incurred, including attorney fees, costs, fees of experts and any legal or other expenses reasonably incurred in connection therewith (collectively, the

5/4/2021

"**Liabilities**"), arising from, based upon, related to or associated with and to the extent caused by (a) any breach of any representation or warranty of the Seller contained in this Agreement; (b) any failure of the Seller to perform or observe any term, condition or covenant contained in this Agreement; (c) any Liability related to or involving the Company's activities arising, resulting or incurred from any event that occurred before the Closing Date; and (d) any and all tax Liabilities with respect to the Interests arising, resulting or incurred on or prior to the Closing Date.

9.      INDEMNIFICATION BY BUYER. The Buyer hereby covenants and agrees to indemnify, save, defend, hold harmless, discharge, and release the Seller and their heirs and legal representatives from and against any and all Liabilities arising from, based upon, related to or associated with (a) any breach of any representation or warranty of the Buyer contained in this Agreement; (b) any failure of the Buyer to perform or observe any terms, conditions or covenants contained in this Agreement; (c) any Liability related to or involving the Company's activities arising, resulting or incurred from any event that occurs after the Closing Date; and (d) any and all tax Liabilities with respect to the Interests arising, resulting or incurred after the Closing Date.

10.      COVENANTS.

10.1.      Confidentiality. From and after the Closing, the parties shall, and shall cause their respective Affiliates and their respective Representatives to, maintain all non-public or confidential information relating to the this Agreement and the Company and its business, and any other proprietary or confidential information disclosed to any such person in connection with this Agreement, including the terms and conditions of the transactions contemplated by this Agreement, in confidence and not disclose to any other person or use any such information for any purpose, except to the extent that (a) disclosure is required by applicable laws, regulations or court orders to which the parties or their respective Affiliates are subject, or (b) at the time of disclosure, such information is generally available to and known by the public (other than a result of a violation of this Section 10.1 by a party receiving the information or its Affiliates). The parties hereby agree, and shall cause their respective Affiliates, to protect such confidential or proprietary information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use or disclosure of such information as the parties and their respective Affiliates use to protect their own confidential information of a like nature.  As used herein, the term "**Affiliate**" shall mean the party and any other entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such party and "**Representative**" shall mean each party's accountants and attorneys.

10.2.      Further Assurances; Post-Closing Cooperation.  The parties shall execute such further documents and do any and all such further things as may be necessary to implement and carry out the intent of this Agreement and any agreement or instrument executed in connection herewith. The parties shall work cooperatively after the Closing to ensure a smooth transition of ownership Interests.

10.3.      Cash in Account. As of the Closing, the Seller commits to leaving $100,000 in cash in the Accounts (the "**Target Cash Balance**"). If, as of the Closing Date the actual cash balance in the Accounts (the "**Actual Cash Balance**") exceeds the Target Cash Balance, it is agreed that the difference between the Target Cash Balance and the Actual Cash Balance shall distributed to the Seller. If, as of the Closing Date the Actual Cash Balance is less than the Target Cash Balance, it is agreed

that the Seller shall make payment to the Buyer of an amount equal to the difference between the Actual Cash Balance and the Target Cash Balance.

       10.4. <u>Non-Competition</u>. Buyer, and each of its owners, Regan Archibald and Cade Archibald, have agreed to devote their full time and interest to the Company. Therefore, each of Buyer, Regan Archibald and Cade Archibald agree to not participate in any business opportunities that are distracting or competitive to the Company until such time as the Notes have been paid in full. Additionally, it is the intent of Seller to not open, operate, consult a competing clinic or surgical center within a 25 mile radius of the current Company headquarters until the first anniversary of the Effective Date.

       11.     LIMITATION ON LIABILITY.  In no event shall either party be liable for any damages other than direct damages for any claim arising under this Agreement.  Specifically, neither party shall be liable for any indirect, special, incidental, consequential, lost profits, punitive or any other damages beyond direct damages.

       12.     SURVIVAL OF REPRESENTATIONS AND COVENANTS. The Buyer and the Seller hereby agree and covenant that all of the representations, warranties and covenants in this Agreement shall survive the Closing or termination of this Agreement for a period of one (1) year.

       13.     ENTIRE AGREEMENT. This Agreement and the exhibits attached to this Agreement constitute the entire agreement and understanding between the Buyer and the Seller and supersede any and all prior understandings, agreements or representations between the Buyer and the Seller, whether written or oral, related in any way to the subject matter of this Agreement.

       14.     BINDING EFFECT. This Agreement shall be binding upon, and shall inure to the benefit of, the Buyer, the Seller and their respective heirs, legal representatives successors and permitted assigns.

       15.     NOTICES. Any notices or communications required or permitted to be given by this Agreement must be (a) given in writing, and (b) be personally delivered or mailed by prepaid mail or overnight courier, or by facsimile or email transmission delivered or transmitted to the party to whom such notice or communication is directed, to the address of such party as follows:

To the Company:

Integrated Holding Company, LLC
Attn: Scott Frogley
10376 South Jordan Gateway
South Jordan, Utah 84095
Email: drscott@thewellgroup.com

To the Seller:

Dr. Randy E. Woodward DC, PC
12927 Ringtail Cove
Draper, Utah 84020
Email: randywoodward@gmail.com

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-45FB-A4D6-F57FEE09CDEB

To the Buyer:

RJ&CS SC Holdings, LLC
Attn: Cade and Regan Archibald
151 East Edgecombe Drive
Salt Lake City, Utah 84103
Email: acuregan@gmail.com and cade@gowellness.com

Any such notice or communication shall be deemed to have been given on (w) the day such notice or communication is personally delivered, (x) three (3) days after such notice or communication is mailed by prepaid certified or registered mail, (y) one (1) working day after such notice or communication sent by overnight courier, or (z) on the day such notice or communication is faxed and the sender has received a confirmation of such fax. Any party may, for purposes of this Agreement, change its address, fax number, or the person to whom a notice or other communication is marked to the attention of, by giving notice of such change to the other parties.

16.  ASSIGNMENT. Neither party may assign any of their rights, or delegate any of their duties or obligations, under this Agreement without the prior written consent of the other party, which consent may be withheld, conditioned or delayed at such other party's sole discretion.

17.  MULTIPLE COUNTERPARTS. This Agreement may be executed, by facsimile or otherwise, in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

18.  HEADINGS. The headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

19.  AMENDMENTS. This Agreement may be amended at any time by a written instrument signed by the Buyer and the Seller.

20.  WAIVER; INJUNCTIVE RELIEF. No failure on the part of the Buyer or the Seller to exercise, and no delay in exercising, any right, power or remedy created under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No waiver by the Buyer or the Seller to any breach of, or default in, any term or condition of this Agreement shall constitute a waiver of or assent to any succeeding breach of or default in the same or any other term or condition of this Agreement. The terms and provisions of this Agreement, whether individually or in their entirety, may only be waived in writing and signed by the party against whom or which the enforcement of such waiver is sought. No right, remedy or election given by any term of this Agreement or made by either party shall be deemed exclusive, but shall be cumulative with all other rights, remedies and elections available at law or in equity.

21.  SEVERABILITY. If any provision contained in this Agreement shall for any reason be held to be invalid, illegal, void or unenforceable in any respect, such provision shall be deemed modified so as to constitute a provision conforming as nearly as possible to the invalid, illegal, void or

5/4/2021

unenforceable provision while still remaining valid and enforceable and the remaining terms or provisions contained in this Agreement shall not be affected thereby.

22.     PREVAILING PARTY. In the event that either party brings any suit, action or proceeding against the other party for any reason arising from or related to this Agreement, then the prevailing party shall be entitled to recover from the other party any and all costs and expenses, including reasonable attorney fees, arising from or related to the suit, action or proceeding.

23.     FURTHER ACTIONS. From and after the execution of this Agreement, the Buyer and the Seller agree to, upon the request of the other party, execute and deliver to the other party any further documents, certificates or instruments, and to perform any further acts as may be required or reasonably requested to complete or evidence the transaction contemplated by this Agreement.

24.     CONSTRUCTION. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted by the Buyer and the Seller, and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement.

25.     ABSENCE OF REVIEW. Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the transfer of the Interests or determined this Agreement or any other document related to this Agreement is truthful or complete. Any representation to the contrary is a criminal offense.

26.     PLURAL; GENDER. Words used in this Agreement in the singular, where the context so permits, shall be deemed to include the plural and vice versa. Words used in the masculine or the feminine, where the context so permits, shall be deemed to mean the other and vice versa. The definitions of words in the singular in this Agreement shall apply to such words when used in the plural where the context so permits and vice versa, and the definitions of words in the masculine or feminine in this Agreement shall apply to such words when used in the other form where the context so permits and vice versa.

27.     GOVERNING LAW; VENUE; JURISDICTION. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Utah, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Utah or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Utah. The Buyer and the Seller further agree that any dispute arising out of this Agreement shall be decided by either the state or federal court in Utah County, Utah. The Buyer and the Seller shall each submit to the jurisdiction of those courts and agree that service of process by certified mail, return receipt requested, shall be sufficient to confer said courts with in personam jurisdiction.

28.     WAIVER OF JURY TRIAL. EACH SELLER AND THE BUYER HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY ISSUE TRIABLE BY A JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT NOW OR HEREAFTER EXISTS WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION WITH THIS AGREEMENT. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY EACH SELLER AND THE BUYER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-45FD-A4D6-5E7FEE09CDEB

AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY MAY OTHERWISE ACCRUE. EACH SELLER AND THE BUYER ARE HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY THE OTHER PARTY.

[Signatures begin on following page]

5/4/2021

DocuSign Envelope ID: 7AEE5686-6246-45FB-A4D6-F57FEE09CDEB

IN WITNESS WHEREOF, the Parties have executed this Amended and Restated Membership Interest Purchase Agreement effective as of the Effective Date.

**SELLER**:                                              **BUYER**:

Dr. Randy E. Woodward DC, PC                            RJ&CS SC Holdings, LLC

By: _Randy Woodward_          5/4/2021          By: _Regan Archibald_          5/4/2021
Randy E. Woodward, President                            Regan Archibald, Manager


**COMPANY**:                                            By: _Cade Archibald_          5/4/2021
                                                        Cade Archibald, Manager


Integrated Holding Company, LLC

By: _SCOTT FROGLEY_          5/4/2021
Scott Frogley, Manager

By: _Randy Woodward_          5/4/2021
Randy E. Woodward, Manager

**As to Section 10.4 only**:

_Regan Archibald_          5/4/2021
Regan Archibald

_Cade Archibald_          5/4/2021
Cade Archibald

**EXHIBIT A – 1**
**SECURED PROMISSORY NOTE**

$2,000,000.00                                                          **Dated: May 3, 2021**

This Secured Promissory Note (the "**Note**") is dated the 3rd day of May, 2021 ("**Date of Execution**"), RJ&CS SC Holdings, LLC, a Utah limited liability company (the "**Maker**"), promises to pay to Dr. Randy E. Woodward DC, PC, a Utah professional corporation (the "**Holder**"), in lawful money of the United States of America, the following principal sum, together with any other advances made pursuant to this Note.

The parties to this Note are also parties to that certain Membership Interest Purchase Agreement (the "**MIPA**") to which this Note is attached as Exhibit A-1.

1.      NOTE AMOUNT: For value received, Maker promises to pay Holder the principal sum of **TWO MILLION DOLLARS AND NO CENTS** ($2,000,000.00) in lawful U.S. currency, together with interest as computed below, and costs, fees or expenses arising from Maker's obligations stated herein. This principal sum, along with all accrued interest and any other cost or expenses of Maker hereunder shall be referred to hereafter as the "**Note Balance**")

2.      NOTE TERM: The term of this Note shall begin on the Date of Execution and shall become due and payable in full on the earlier of: (a) the third (3rd) anniversary of the Date of Execution or (b) an Event of Default (the "**Maturity Date**").

3.      INTEREST AND PAYMENTS:

        a.      Maker agrees to pay interest in respect of the outstanding Note Balance of the Note to Holder at a rate per annum equal to five percent (5%) (the "**Rate**").

        b.      The interest due on the Note shall be computed for the actual number of days elapsed during the related interest period on the basis of a year consisting of 360 days and shall be calculated by determining the average daily outstanding principal balance of the Note for each day of such interest period.

        c.      Upon the occurrence and during the continuation of an Event of Default under this Note, interest shall accrue at the Rate then in effect *plus* six percent (6%) per annum (the "**Default Rate**"). Interest at the Default Rate shall accrue from the initial date of such Event of Default until such Event of Default is waived or ceases to be in effect (including in conjunction with termination of this Note) and shall be payable upon demand.

4.      PAYMENT TERMS: Any payment made hereunder shall be made as follows:

        a.      Monthly Payments. Maker shall pay to Holder monthly installments of principal and interest in amounts calculated to amortize (calculated on the basis of a 360-day year over a three (3) year amortization period (hereafter, the "**Amortization Period**")) the then outstanding Note Balance in full over the Amortization Period (the regularly scheduled monthly installments of principal and interest described in this Section 4(a) are hereinafter referred to as "**Monthly Installments**") calculated based upon the Rate, or, as the case may be, the Default Rate then in effect with such Monthly

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-45FB-A4D6-F57FEE09CDEB

Installments being recalculated as provided for in this Note. Holder shall notify Maker in writing of the amounts of the Monthly Installments required under this <u>Section 4(a)</u> promptly upon Holder's determination thereof.

        b.     <u>Exception</u>. Notwithstanding <u>Section 4(a)</u>, following the Date of Execution and continuing until the first anniversary thereof, Maker may make monthly payments under <u>Section 4(a)</u> equal to the lesser of: (i) monthly distributions paid to Maker from Integrated Holding Company, LLC, a Utah limited liability of which Maker is a member and (ii) the Monthly Installment amount (determined under <u>Section 4(a)</u> above); provided that Maker shall make the full Monthly Installment payments if Integrated Holding Company, LLC has a reasonable sufficient balance in its accounts to pay for one full month of historic expenses. If the monthly distributions to Maker from Integrated Holding Company, LLC exceed the Monthly Installment amount for any given month, the monthly payment shall also include such excess distribution amount to the extent that the aggregate of the amounts paid to Holder in prior months is less than the Monthly Installments for such months.

        c.     <u>How Payments Made</u>. Payments may be made to Holder by mailing, bank transfer or hand-delivery to Holder at the address stated below, or such other place as Holder may from time to time designate in writing to Maker, receipt of which shall be acknowledged in writing by Maker.

        d.     <u>Collection</u>. Any check, draft, money order, or other instrument given in payment of all or any portion of the Note Balance will be accepted by Holder and handled in collection in the customary manner, but the same shall not constitute payment hereunder unless actual cash proceeds of such instruments are unconditionally received by Holder.

        5.     <u>PREPAYMENT RIGHT</u>: Maker may prepay any part of this Note without penalty.

        6.     <u>SECURITY</u>: (a) The payment and performance of the Note Balance shall be secured by the Pledge Agreement which is attached to the MIPA as <u>Exhibit B</u> (the "**Pledge Agreement**") to be executed by Maker in favor of Holder for the purpose of creating and perfecting a security interest in all of Maker's ownership interests in the Company consisting of a 50% interest in the issued and outstanding Company membership interests (the "**Interests**").

        7.     <u>EVENTS OF DEFAULT</u>: Maker shall be in default upon the occurrence of any of the following and delivery of written notice from Holder to Maker and such event remains is not cured for five (5) business days after receipt of said written notice (each, an "**Event of Default**"): (a) Maker fails to make payment required under <u>Section 4</u> when due; (b) Maker breaks any promise or commitment it has made to Holder with regard to this debt, or fails to comply with or perform on any term, provision or obligation in this Note; (c) Maker defaults under any loan, extension of credit, security agreement, purchase or sales agreement or other commitment to any creditor which might reasonably be expected to negatively impact Holder's position in the collateral offered by Maker for this Note or Maker's ability to either repay or guarantee payment of this Note and related documents; (d) any affirmative representation, act or omission by Maker or on Maker's behalf to Holder or Holder's agent is false or misleading in any material respect either at the time made or any time thereafter; (e) Maker's dissolution or the death of either Regan Archibald or Cade Archibald; (f) Maker becomes insolvent or a receiver or trustee is appointed for any part of such Maker's property; (g) Maker makes an unauthorized assignment which interferes with or negatively impacts Holder's interests herein; or any proceeding is commenced by Maker or against Maker under bankruptcy or insolvency laws; or (h) any creditor takes action against any security offered to Holder herein.

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-45FD-A4B6-F57FEE09CDEB

a.      Time is of the essence with regard to all due dates and default acts or omissions. Upon the occurrence of any of the foregoing Events of Default.

b.      Upon an Event of Default, all outstanding Note Balance shall bear interest at the Default Rate until the Event of Default is cured. Except for the written notice stated herein, Maker and any surety, endorser or guarantor waive all demands for payment, presentation for payment, notices of intentions to accelerate to the extent permitted by law.

c.      If Maker defaults, it agrees to pay to Holder of the Note all costs and fees associated with collection of the debt, including reasonable attorney's fees incurred before and after judgment, and including any bankruptcy proceedings or appeal.

d.      Forbearance on the part of Holder in enforcing a right or remedy set forth herein shall not be deemed a waiver of that right or remedy or any other remedy available at law or in equity.

8.      ACCESS TO COMPANY FINANCIAL RECORDS. Not later than forty-five (45) days following the end of each fiscal quarter during the term of this Note, Maker shall provide Holder with copies of the Company's (a) unaudited balance sheet, (ii) unaudited statement of income (loss), and (iii) unaudited profit and loss statement for such fiscal quarter (collectively, the "**Company Financial Reports**"), prepared in accordance with past practice. Maker shall provide additional reasonable access to the Company's financial records and bank statements to answer any questions from Holder related to the Company Financial Reports.

9.      NEGATIVE COVENANTS: Until all sums due hereunder have been paid in full, Maker agrees to not sell, contract to sell, convey, assign, transfer, mortgage, pledge, hypothecate, encumber, or in any way alienate any part of the Interests without Holder's consent, which shall not be reasonably withheld. If Maker attempts any sale, conveyance, assignment, transfer, mortgage, pledge, hypothecation, or encumbrance of the Interest then Holder may, at its sole election, declare the Note Balance, unpaid accrued interest, and all other sum due to Maker hereunder immediately due and payable in full, without further presentment, demand, protest or notice of any kind.

10.     SEVERABILITY: If any provision of this Note or the application thereof shall, for any reason, be held invalid or unenforceable by a court or arbiter of competent jurisdiction, neither the remainder of this Note nor the application of that provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

11.     BINDING EFFECT: The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

12.     DESCRIPTIVE HEADINGS: The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations under this Note.

13.     CONSTRUCTION: The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-45FD-A4D6-F57FEE09CDEB

14. <u>MODIFICATION</u>: Holder and Maker may modify the terms of this Note, in writing, without notice to any other entity or individual, including, but not limited to extensions, renewals, changes or additions to security or collateral or the addition of guarantees. No such modification shall be deemed as limiting or negating the liability of any party hereunder.

15. <u>GOVERNING LAW</u>: This Note shall be governed, construed and interpreted by, through and under the Laws of the State of Utah; and the parties consent to exclusive jurisdiction in Salt Lake City County, Utah.

16. <u>NOTICE, FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS</u>:  Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed below, or to any other address designated in writing. Time is of the essence. Any notices under this Note shall be delivered to the following addresses:

| | |
|---|---|
| If to Holder, to: | Dr. Randy E. Woodward DC, PC |
| | 12927 Ringtail Cove |
| | Draper, Utah 84020 |
| | Email: randywoodward@gmail.com |
| | |
| If to Maker, to: | RJ&CS SC Holdings, LLC |
| | Regan Archibald and Cade Archibald, Managers |
| | 151 East Edgecombe Drive |
| | Salt Lake City, Utah 84103 |
| | Email: acuregan@gmail.com and cade@gowellness.com |

16. <u>SIGNATURES</u>: By signing this Note, each party hereto agrees to the terms contained in this Note and acknowledges receipt of a copy of this Note.

17. <u>COUNTERPARTS</u>: This Note may be executed in separate counterparts, each of which will be an original and all of which taken together shall constitute one and the same agreement, and any party hereto may execute this Note by signing any such counterpart.

18. <u>POWER TO CONFESS JUDGMENT</u>.  Maker hereby irrevocably authorizes any attorney at law to appear in any court of record in the State of Utah, or any other State or Territory of the United States, after any indebtedness evidenced hereby or arising hereunder becomes due, whether by acceleration or otherwise, to waive the issuance and service of process and enter an appearance and confess judgment against Maker in favor of Holder or the lawful holder hereof for all amounts then due hereunder, together with costs of suit, and thereupon to release all defects and errors, of any kind or nature, whether substantive, procedural or otherwise, and waive all rights of appeal and to stays of execution.  In the event of an error, omission or mistake in obtaining a cognovit judgment, Maker agrees that the cognovit judgment shall not be set aside, but rather shall be corrected by a nunc pro tunc cognovit judgment entry.  e Maker hereby expressly (a) waives any and all conflicts of interest with respect to any attorney retained by Holder to confess judgment against Maker upon this Note, (b) consents to the attorney retained by Holder in receiving reasonable legal fees from Holder for legal services rendered in connection with confessing judgment against Maker hereupon, and (c) waives any

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-46FB-A4B6-F57FEE09CDEB

and all rights of appeal from any judgment, order or decision rendered in such a cognovit action, and agrees that any judgment, order or decision of the trial court shall be the final determination of such issues as between Holder and Maker. A copy hereof, verified by Holder, may be filed in each such proceeding in place of the filing of the original as a warrant of attorney.  In the case that Maker is a natural person, the death of Maker shall not impair the authority granted herein as to a surviving Maker. The authority and power to appear for and enter judgment against Maker shall not be extinguished by any judgment entered pursuant thereto or in connection therewith. This warrant of attorney to confess judgment shall remain in full force and effect so long as any portion of the obligations evidenced hereby or arising hereunder remains unpaid, and any confession of judgment and subsequent vacation thereof pursuant hereto, shall not constitute termination or limitation of this warrant of attorney to confess judgment in any respect. MAKER HEREBY FURTHER ACKNOWLEDGES AND REPRESENTS THAT THE POWER TO CONFESS JUDGMENT PROVIDED HEREIN IS KNOWINGLY, INTELLIGENTLY AND VOLUNTARILY GIVEN, WITHOUT ANY UNDUE INFLUENCE.

[Signatures on Following Page]

5/4/2021

EXECUTED this 3rd day of May, 2021.

**MAKER:**                                          **HOLDER:**

RJ&CS SC Holdings, LLC                    Dr. Randy E. Woodward DC, PC

By: *Regan Archibald*          5/4/2021          By: *Randy Woodward*          5/4/2021
2185010DB09B4A8...                                     5E9AAE186B174CA...
Regan Archibald, Manager                          Randy E. Woodward, President


By: *Cade Archibald*          5/4/2021
DEE6AF152F2F42C...
Cade Archibald, Manager

**EXHIBIT A – 2**
**SECURED PROMISSORY NOTE**

$2,758,154.00                                                   **Dated: May 3, 2021**

This Secured Promissory Note (the "**Note**") is dated the 3rd day of May, 2021 ("**Date of Execution**"), wherein RJ&CS SC Holdings, LLC, a Utah limited liability company (the "**Maker**"), promise to pay to Dr. Randy E. Woodward DC, PC, a Utah professional corporation (the "**Holder**"), in lawful money of the United States of America, the following principal sum, together with any other advances made pursuant to this Note.

The parties to this Note are also parties to that certain Membership Interest Purchase Agreement (the "**MIPA**") to which this Note is attached as Exhibit A-2.

1.      NOTE AMOUNT: For value received, Maker promises to pay Holder the principal sum of **TWO MILLION SEVEN HUNDRED AND FIFTY-EIGHT THOUSAND ONE HUNDRED AND FIFTY-FOUR DOLLARS AND NO CENTS** ($2,758,154.00) in lawful U.S. currency, together with interest as computed below, and costs, fees or expenses arising from Maker's obligations stated herein. This principal sum, along with all accrued interest and any other cost or expenses of Maker hereunder shall be referred to hereafter as the "**Note Balance**")

2.      NOTE TERM: The term of this Note shall begin on the Date of Execution and shall become due and payable in full on the earlier of: (a) the date upon which the Note Balance has been paid in full under Section 4 below, or (b) an Event of Default (the "**Maturity Date**").

3.      INTEREST RATE:

        a.      Maker agrees to pay interest in respect of the outstanding Note Balance of the Note to Holder at a rate per annum equal to five percent (5%) (the "**Rate**").

        b.      The interest due on the Note shall be computed for the actual number of days elapsed during the related interest period on the basis of a year consisting of 360 days and shall be calculated by determining the average daily outstanding principal balance of the Note for each day of such interest period.

        c.      Upon the occurrence and during the continuation of an Event of Default under this Note, interest shall accrue at the Rate then in effect *plus* six percent (6%) per annum (the "**Default Rate**"). Interest at the Default Rate shall accrue from the initial date of such Event of Default until such Event of Default is waived or ceases to be in effect (including in conjunction with termination of this Note) and shall be payable upon demand.

4.      PAYMENT TERMS: Any payment made hereunder shall be made as follows:

        a.      Monthly Payments. For the period beginning on the Date of Execution and continuing until the Note Balance has been paid in full, Maker shall pay to Holder a sum equal to fifteen percent (15%) of Maker's 50% interest of the Gross Collections of Integrated Holding Company, LLC. Each such monthly payment shall be made on or before 15th day of the following month. The term "**Gross Collections**" shall be defined as the entire amount of all revenue of Integrated Holding

5/4/2021

Company, LLC, including without limitation all receipts, determined on a cash basis, from any subsidiary of Integrated Holding Company, LLC (including, without limitation, Utah Intermountain Anesthesia, LLC, Integrated Wellness Utah, LLC, Utah Intermountain Pain Management, LLC and Utah Intermountain Surgical Center, LLC, and any successors thereof) as determined by reports generated by Advanced Reimbursement Solutions, LLC and/or Gemini Billing Company, LLC and any other company retained by Integrated Holding Company, LLC or any of its subsidiaries to bill or collect its revenue.

        b.    <u>Payments</u>. Payments may be made to Holder by mailing, bank transfer or hand-delivery to Holder at the address stated below, or such other place as Holder may from time to time designate in writing to Maker, receipt of which shall be acknowledged in writing by Maker.

        c.    <u>Collections</u>. Any check, draft, money order, or other instrument given in payment of all or any portion of the Note Balance will be accepted by Holder and handled in collection in the customary manner, but the same shall not constitute payment hereunder unless actual cash proceeds of such instruments are unconditionally received by Holder.

    5.    <u>PREPAYMENT RIGHT</u>: Maker may prepay any part of this Note without penalty.

    6.    <u>SECURITY</u>: (a) The payment and performance of the Note Balance shall be secured by the Pledge Agreement which is attached to the MIPA as <u>Exhibit B</u> (the "**Pledge Agreement**") to be executed by Maker in favor of Holder for the purpose of creating and perfecting a security interest in all of Maker's ownership interests in the Company consisting of a 50% interest in the issued and outstanding Company membership interests (the "**Interests**").

    7.    <u>EVENTS OF DEFAULT</u>: Maker shall be in default upon the occurrence of any of the following and delivery of written notice from Holder to Maker and such event remains is not cured for five (5) business days after receipt of said written notice (each, an "**Event of Default**"): (a) Maker fails to make a Note Payment when due; (b) Maker breaks any promise or commitment it has made to Holder with regard to this debt, or fails to comply with or perform on any term, provision or obligation in this Note; (c) Maker defaults under any loan, extension of credit, security agreement, purchase or sales agreement or other commitment to any creditor which might reasonably be expected to negatively impact Holder's position in the collateral offered by Maker for this Note or Maker's ability to either repay or guarantee payment of this Note and related documents; (d) any affirmative representation, act or omission by Maker or on Maker's behalf to Holder or Holder's agent is false or misleading in any material respect either at the time made or any time thereafter; (e) Maker's dissolution or the death of either Regan Archibald or Cade Archibald; (f) Maker becomes insolvent or a receiver or trustee is appointed for any part of such Maker's property; (g) Maker makes an unauthorized assignment which interferes with or negatively impacts Holder's interests herein; or any proceeding is commenced by Maker or against Maker under bankruptcy or insolvency laws; or (h) any creditor takes action against any security offered to Holder herein.

        b.    Time is of the essence with regard to all due dates and default acts or omissions. Upon the occurrence of any of the foregoing Events of Default.

        c.    Upon an Event of Default, all outstanding Note Balance shall bear interest at the Default Rate until the Event of Default is cured. Except for the written notice stated herein, Maker and any surety, endorser or guarantor waive all demands for payment, presentation for payment, notices

DocuSign Envelope ID: 7AEE5586-6246-45FB-A4D6-F57FEE09CDEB

of intentions to accelerate to the extent permitted by law.

        e.    If Maker defaults, it agrees to pay to Holder of the Note all costs and fees associated with collection of the debt, including reasonable attorney's fees incurred before and after judgment, and including any bankruptcy proceedings or appeal.

        f.    Forbearance on the part of Holder in enforcing a right or remedy set forth herein shall not be deemed a waiver of that right or remedy or any other remedy available at law or in equity.

8.    ACCESS TO COMPANY FINANCIAL RECORDS. During the term of this Note, by the 15th day of each month, Maker agrees to provide Holder with copies of all of the previous months' bank statements for accounts help under the tax ID numbers of Integrated Holding Company, LLC, Utah Intermountain Anesthesia, LLC, Integrated Wellness Utah, LLC, Utah Intermountain Pain Management, LLC and Utah Intermountain Surgical Center, LLC.

9.    <u>NEGATIVE COVENANTS</u>: Until all sums due hereunder have been paid in full, Maker agrees to not sell, contract to sell, convey, assign, transfer, mortgage, pledge, hypothecate, encumber, or in any way alienate any part of the Interests without Holder's consent, which shall not be reasonably withheld. If Maker attempts any sale, conveyance, assignment, transfer, mortgage, pledge, hypothecation, or encumbrance of the Interest then Holder may, at its sole election, declare the Note Balance, unpaid accrued interest, and all other sum due to Maker hereunder immediately due and payable in full, without further presentment, demand, protest or notice of any kind.

10.    <u>SEVERABILITY</u>: If any provision of this Note or the application thereof shall, for any reason, be held invalid or unenforceable by a court or arbiter of competent jurisdiction, neither the remainder of this Note nor the application of that provision to other persons, entities or circumstances shall be affected thereby, but instead shall be enforced to the maximum extent permitted by law.

11.    <u>BINDING EFFECT</u>: The covenants, obligations and conditions herein contained shall be binding on and inure to the benefit of the heirs, legal representatives, and assigns of the parties hereto.

12.    <u>DESCRIPTIVE HEADINGS</u>: The descriptive headings used herein are for convenience of reference only and they are not intended to have any effect whatsoever in determining the rights or obligations under this Note.

13.    <u>CONSTRUCTION</u>: The pronouns used herein shall include, where appropriate, either gender or both, singular and plural.

14.    <u>MODIFICATION</u>: Holder and Maker may modify the terms of this Note, in writing, without notice to any other entity or individual, including, but not limited to extensions, renewals, changes or additions to security or collateral or the addition of guarantees. No such modification shall be deemed as limiting or negating the liability of any party hereunder.

15.    <u>GOVERNING LAW</u>: This Note shall be governed, construed and interpreted by, through and under the Laws of the State of Utah; and the parties consent to exclusive jurisdiction in Salt Lake City County, Utah.

16.    NOTICE, FINANCIAL REPORTS AND ADDITIONAL DOCUMENTS:  Unless otherwise required by law, any notice will be given by delivering it or mailing it by first class mail to the appropriate party's address listed below, or to any other address designated in writing. Time is of the essence. Any notices under this Note shall be delivered to the following addresses:

If to Holder, to:    Dr. Randy E. Woodward DC, PC
12927 Ringtail Cove
Draper, Utah 84020
Email: randywoodward@gmail.com

If to Maker, to:    RJ&CS SC Holdings, LLC
Regan Archibald and Cade Archibald, Managers
151 East Edgecombe Drive
Salt Lake City, Utah 84103
Email: acuregan@gmail.com and cade@gowellness.com

16.    SIGNATURES: By signing this Note, each party hereto agrees to the terms contained in this Note and acknowledges receipt of a copy of this Note.

19.    COUNTERPARTS: This Note may be executed in separate counterparts, each of which will be an original and all of which taken together shall constitute one and the same agreement, and any party hereto may execute this Note by signing any such counterpart.

[Signatures on Following Page]

5/4/2021

EXECUTED this 3rd day of May, 2021.

**MAKER:**                                        **HOLDER:**

RJ&CS SC Holdings, LLC                    Dr. Randy E. Woodward DC, PC

By: _Regan Archibald_          5/4/2021     By: _Randy Woodward_          5/4/2021
    ‾‾‾2185010DB09B4A8‾‾‾                        ‾‾‾5E9AAE106B174CA...‾‾‾
    Regan Archibald, Manager                    Randy E. Woodward, President

By: _Cade Archibald_          5/4/2021
    ‾‾‾DEE6AF152F2F42C...‾‾‾
    Cade Archibald, Manager

DocuSign Envelope ID: 7AEE5586-6246-45FB-A4D6-F57FEE09CDEB

**EXHIBIT B**

**MEMBERSHIP INTEREST PLEDGE AGREEMENT**

This MEMBERSHIP INTEREST PLEDGE AGREEMENT (this "**Agreement**") is entered into as of May 3rd, 2021 (the "**Effective Date**") by and between Dr. Randy E. Woodward DC, PC, a Utah professional corporation ("**Pledgee**") and RJ&CS SC Holdings, LLC, a Utah limited liability company (the "**Pledgor**") pursuant to the terms and conditions of that certain Membership Interest Purchase Agreement of even date herewith by and between Pledgor, as "Buyer" and Pledgee, as "Seller" (the "**Purchase Agreement**"). All capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Purchase Agreement.

A.　　Pledgor has agreed to pledge all of its 50% membership interest in Integrated Holding Company, LLC, a Utah limited liability company (the "**Company**") being purchased by Pledgor pursuant to the Purchase Agreement (the "**Pledged Interest**") to secure Pledgor's performance of its obligations under those certain Secured Promissory Notes of even date herewith by and between Pledgor, as "Maker" and Pledgee, as "Holder" (collectively, the "**Notes**").

B.　　Pledgee is willing to enter into the Purchase Agreement only upon receiving Pledgor's pledge of the Pledged Interest as set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises, the mutual covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.　　Grant of Security Interest. Pledgor hereby pledges to Pledgee as collateral and security for the Secured Obligations (as defined in Section 2) a security interest in the Pledged Interest, with all of the rights of a secured party under the Utah Uniform Commercial Code, until all payment obligations of Pledgor are paid in full according to the terms of the Notes. Pledgee shall have the right to exercise the rights and remedies set forth herein and in the Notes if a default thereunder shall occur. Such Pledged Interest, together with any additions, replacements, accessions or substitutes therefor or proceeds thereof, are hereinafter referred to collectively as the "**Collateral**".

2.　　Secured Obligations. During the term hereof, the Collateral shall secure the performance by Pledgor of all of its payment obligations under the Notes (the "**Secured Obligations**").

3.　　Perfection of Security Interests. Pledgor hereby authorizes Pledgee to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral, and agrees to take all such other actions and to execute and deliver and file or cause to be filed such other instruments or documents, as Pledgee may reasonably require in order to establish and maintain a perfected, valid, and continuing security interest and lien in the Collateral in accordance with this Agreement and the UCC and other applicable law.

4.　　Representations and Warranties of Pledgor. Pledgor represents and warrants hereby to Pledgee as follows with respect to the Pledged Interest:

5/4/2021

DocuSign Envelope ID: 7AEE5686-6246-45FB-A4D6-F57FEE09CDEB

a.      <u>Title</u>. Pledgor is the sole owner of the Collateral, having good and marketable title thereto. The Pledged Interest is subject to the applicable transfer restrictions which may be imposed under the operating agreement of the Company or other governing documents of the Company or applicable federal and state securities laws.

b.      <u>Binding Effect</u>. This Agreement constitutes a legal, valid and binding obligation of Pledgor enforceable in accordance with its terms (except as the enforcement thereof may be limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium, and similar laws now or hereafter in effect).

5.      <u>Preservation of the Value of the Collateral</u>. Pledgor shall pay all taxes, charges, and assessments against the Collateral and do all acts necessary to preserve and maintain the value thereof.

6.      <u>Collection of Distributions and Interest</u>. During the term of this Agreement and so long as no default has occurred and is continuing under any part of the Notes, Pledgor is authorized to collect all distributions, dividends, guaranteed payments and other amounts that may be, or may become, received from ownership of the Collateral, with respect to the number of units of the Pledged Interest held by Pledgor. However, if an Event of Default (defined below) should occur, Pledgee shall thereby be authorized to collect all distributions, dividends, guaranteed payments and other amounts that may be, or may become, received from ownership of the Collateral, with respect to the Pledged Interest.

7.      <u>Voting Rights</u>. Unless and until Pledgee has rightfully exercised its rights under this Agreement to foreclose its security interest in the Collateral, Pledgor shall have the right to exercise any voting rights evidenced by, or relating to, the Collateral.

8.      <u>Pledgee Not a Member or Partner</u>. The pledge of the Pledged Interest hereunder does not, in and of itself, constitute an assignment of any rights <u>or</u> obligations of Pledgor as a member in or of the Company. Pledgee is not, in any manner or respect, a member, partner or joint venturer in or with the Company.

9.      <u>Remedies upon Default</u>. Upon the occurrence and during the continuance of a default under either Note (an "**<u>Event of Default</u>**"), Pledgee may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party on default under applicable law (irrespective of whether such applies to the affected items of Collateral). Pledgor agrees that, to the extent notice of sale shall be required by law, at least twenty (20) calendar days' notice to Pledgor of the time and place of any public sale or the time after which a private sale is to be made shall constitute reasonable notification.

10.     <u>Termination of Agreement and Security Interests</u>. Pledgee covenants and agrees that on the date on which all of payment obligations set forth in both Notes are paid in full (the "**<u>Termination Date</u>**"), this Agreement and all security interests granted hereunder with respect to the Collateral shall terminate (and all such security interests shall be deemed released). At the Termination Date, Pledgor, as Pledgee's attorney-in-fact for that limited purpose, shall be authorized to terminate all UCC Financing Statements (Form UCC-1) (each a "**<u>Financing Statement</u>**") filed hereunder by way of filing a UCC Financing Statement Amendment (Form UCC-3) with respect to each such Financing Statement, and to take all other action (including making all filings) necessary to reflect that this Agreement and the security interests granted hereunder have terminated. Any portion

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-46FB-A4D6-F57FEE09CDEB

of the Collateral held by or on behalf of Pledgee shall be returned to Pledgor within five (5) business days of the Termination Date and Pledgee shall timely execute and deliver to Pledgor, and file and/or record, as necessary, all such documents as Pledgor shall reasonably request to evidence the termination of this Agreement and all security interests granted hereunder and the return of the Collateral to Pledgor. Notwithstanding any other provision contained herein, all provisions of this Agreement that by their nature are intended to survive the termination of this Agreement shall survive the termination of this Agreement.

11.     <u>Application of Collateral Proceeds</u>. Upon the occurrence and during the continuance of an Event of Default, any cash held by Pledgee as Collateral and all cash proceeds received by Pledgee in respect of any sale of, collection from, or other realization, upon all or any part of the Collateral pursuant to the exercise by Pledgee of its remedies as a secured creditor as provided in <u>Section 9</u> shall be paid to and applied as follows:

        a.     <u>*First*</u>, to the payment of reasonable costs and expenses, including all amounts expended to preserve the value of the Collateral, of foreclosure or suit, if any, and of such sale and the exercise of any other rights or remedies, and of all proper fees, expenses, liability and advances, including reasonable legal expenses and attorneys' fees, incurred or made hereunder by Pledgee;

        b.     <u>*Second*</u>, to the payment to Pledgee of the amount then owing or unpaid in either Note (to be applied first to accrued interest and second to outstanding principal); and

        c.     <u>*Third*</u>, pro-rata to the payment of the surplus, if any, to Pledgor, its assigns, or to whosoever may be lawfully entitled to receive the same.

12.     <u>Expenses</u>. Pledgor agrees to pay and reimburse Pledgee upon demand for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Pledgee may incur in connection with the custody, use or preservation of, or the sale of, collection from or other realization upon, any of the Collateral, and each of Pledgor and Pledgee (the "**Obligor**") agree to pay and reimburse the other (the "**Obligee**") upon demand for all reasonable costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) that Obligee may incur in connection with  (b) the exercise or enforcement of any rights or remedies granted to Obligee hereunder, under either Note or otherwise available to it (whether at law, in equity or otherwise), or (c) the failure by Obligor to perform or observe any of the provisions hereof.

13.     <u>Governing Law; Venue</u>. This Agreement shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Agreement shall be governed by, the internal laws of the State of Utah, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Utah or any other jurisdictions) that would cause the application of the laws of any jurisdictions other than the State of Utah. The provisions set forth in the Notes to determine the proper venue for any disputes are incorporated herein by this reference.

14.     <u>Waivers and Amendments</u>.

        a.     <u>Non-waiver</u>. No failure or delay on either party's part in exercising any right hereunder shall operate as a waiver thereof or of any other right nor shall any single or partial exercise of any such right preclude any other further exercise thereof or of any other right.

5/4/2021

      b.    <u>Amendments and Waivers</u>. This Agreement may not be amended or modified, nor may any of its terms be waived, except by written instruments signed by Pledgor and Pledgee.

      c.    <u>Notices</u>. Unless otherwise provided for herein, all notices, requests, demands, claims and other communications hereunder shall be sent to the following addresses:

If to Pledgee, to:    Dr. Randy E. Woodward DC, PC
                    12927 Ringtail Cove
                    Draper, Utah 84020
                    Email: randywoodward@gmail.com

If to Pledgor, to:    RJ&CS SC Holdings, LLC
                    Regan Archibald and Cade Archibald, Managers
                    151 East Edgecombe Drive
                    Salt Lake City, Utah 84103
                    Email: <u>acuregan@gmail.com</u> and cade@gowellness.com

15.    <u>Headings</u>. Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement or be given any substantive effect.

16.    <u>Attorney Fees</u>. In the event of dispute of the Agreement, the prevailing party shall be entitled to reasonable attorney fees and expenses paid by such prevailing party in connection with the litigation and/or dispute. Nothing herein shall restrict or impair a court's power to award fees and expenses for frivolous or bad faith pleading.

17.    <u>Successor and Assigns; Assignment</u>. The terms and provisions of this Agreement shall be binding upon, and, subject to the provisions of this <u>Section 17</u>, the benefits thereof shall insure to, the parties hereto and their respective successors and assigns; *provided, however,* that the rights, interests or obligations of Pledgee hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by Pledgee without the prior written consent of Pledgor.

18.    <u>Severability</u>. If any part of this Agreement is construed to be in violation of any law, such part shall be modified to achieve the objective of the parties to the fullest extent permitted by law and the balance of this Agreement shall remain in full force and effect.

19.    <u>Entire Agreement</u>. This Agreement, together with the Notes and the Purchase Agreement, constitute and contain the entire agreement between Pledgee and Pledgor and supersede all prior agreements and understandings among the parties hereto with respect to the subject matter hereof.

20.    <u>Counterparts; Facsimile Execution</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or email shall be equally as effective as delivery of an original executed counterpart of this Agreement.

*[Remainder of page intentionally left blank; signature page follows]*

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-45FB-A4D6-EE7FEE09CDEB

IN WITNESS WHEREOF, the Pledgor and Pledgee have caused this Agreement to be duly executed and delivered by their officers thereunto, as applicable, duly authorized as of the date first written above.

**PLEDGEE**:                                     **PLEDGOR:**

<u>Dr. Randy E. Woodward DC, PC</u>              <u>RJ&CS SC Holdings, LLC</u>

By: _Randy Woodward_    5/4/2021          By: _Regan Archibald_    5/4/2021
5E9AAE106B174CA...                              2185010DB09B4A8...
Randy E. Woodward, President                   Regan Archibald, Manager


                                                By: _Cade Archibald_    5/4/2021
                                                DEE6AF152F2F42C...
                                                Cade Archibald, Manager

DocuSign Envelope ID: 7AEF5586-6246-45FB-A4D6-FE57FEE09CDEB

## EXHIBIT C

## ASSIGNMENT OF MEMBERSHIP INTEREST

FOR VALUE RECEIVED, and in accordance with that certain that certain Membership Interest Purchase Agreement that is dated as of the 3rd day of May, 2021 (the "**Agreement**"), to which this exhibit is attached, **Dr. Randy E. Woodward DC, PC,** a Utah professional corporation (the "**Assignors**") hereby:

1.     Sells, issues, assigns and transfers all of its fifty percent (50%) membership interest in and to **Integrated Holding Company, LLC**, a Utah limited liability company (the "**Company**"), which membership interests are uncertificated, to **RJ&CS SC Holdings, LLC**, a Utah limited liability company (the "**Assignee**");

2.     Incorporates herein by reference the terms of the Agreement, including, but not limited to, the representations, warranties, covenants, and agreements relating to the membership interests, and further warrants that it will execute any such further assurances of the foregoing representations and warranties as may be reasonably required; and

3.     Irrevocably appoints and instructs the managers (or such other officer with requisite authority), of the Company, as attorney, to transfer the membership interests on the books of the Company, with full power of substitution to carry out the transfer.

Dated effective the 3rd day of May, 2021.

### ASSIGNOR:

Dr. Randy E. Woodward DC, PC

By: _Randy Woodward_                    5/4/2021
5E9AAE106D174CA...
Randy E. Woodward, President

DocuSign Envelope ID: 7AEF5586-6246-45FB-A4D6-FE7FEE09CDEB

## SCHEDULE 3.4

## LITIGATION

Seller has disclosed to Buyer that the State of Utah's regulators have requested more information on 10 patient files. The Company has complied with the request and is waiting additional information.



5/4/2021

## SIDE LETTER AGREEMENT

This Side Letter Agreement (the "**Agreement**"), dated May 4th, 2021, is being entered into by and between Dr. Randy E. Woodward DC, PC, a Utah corporation (the "**PC**"), RJ&CS SC Holdings, LLC, a Utah limited liability company (collectively, the "**Buyer**"), and Integrated Holdings Company, LLC, a Utah limited liability company (the "**Company**"), in connection with the sale of the PC's 50% ownership interest in the Company (the "**Interest**") to the Buyer pursuant to the terms of that certain Membership Interest Purchase Agreement, dated as of May 4th, 2021, by and among the PC and the Buyer, with the Company added as a party thereto (the "**Purchase Agreement**"). Except as otherwise specified herein, all capitalized terms used but not otherwise defined herein shall have the respective meanings assigned thereto in the Purchase Agreement. In addition, any reference to the "Company" shall include each of its subsidiaries at the time of execution of this Agreement.

As a material inducement to the PC to allow for the purchase of the Interest, each of the Buyer and the Company hereby agrees that, in addition to any and all other rights provided to the PC pursuant to the Purchase Agreement or any other agreements entered into by the Company and the PC in connection with the purchase of the Interest or any other securities of the Company, whether before, on or after the date hereof (collectively, including the Purchase Agreement and the other Transaction Agreements, the "**Transaction Documents**"), the PC will be entitled to the following contractual rights:

1.  <u>Continual Care for Randy Woodward and His Immediate Family</u>.  Both the Buyer and the Company agree that the sole owner of the PC, Randy Woodward ("**Randy**"), and his dependents (collectively, the "**Woodward Family Members**") shall be entitled to receive any Clinic services without any cost to the Woodward Family Members except for any direct out-of-pocket costs incurred by the Company for such treatment, and Randy Woodward can receive services at the Surgical Center without cost other than labor and hard costs associated with the procedure, until the later of (a) Randy's death; (b) the Company's dissolution; or (c) the sell or transfer of majority ownership to a third party not affiliated with Scott Frogley, PC or Buyer.

2.  <u>Maintenance of Email Account</u>. The Company shall maintain the email address drrandy@thewellgroup.com under its domain server at no cost for a period of not less than two (2) years from the Closing Date or until the email domain is changed (whichever comes first). Randy will have exclusive access to this email address. Randy agrees to set up forwarding to an updated personal email and an auto response to senders that updates them of his new email.

3.  <u>Insurance Interest</u>. Integrated Wellness Utah, LLC ("**IWU**") is a wholly-owned subsidiary of the Company and is the beneficial interest holder of an interest in the Reliant Group Casualty Insurance Program (the "**Program**"), the terms of which are memorialized in the "Private Information Packet Reliant Group and Casualty Insurance ICC Ltd.", a copy of which is attached to this side letter agreement as <u>Exhibit A</u>. Immediately prior to the Closing, it is agreed that IWU will transfer 50% of this interest (the "**Insurance Interest**") to PC and that, as a result, the Insurance Interest will not be an asset of the Company or of IWU at the Closing. The "**transfer**" of the Insurance Interest will mean a transfer of the right to the following:

      (a)      50% of any claims paid to and received by IWU from the Program; and

      (b)      50% of any Risk Adjusted Return of Premium Benefit from the Program that are received by Integrated Wellness.

5/4/2021

DocuSign Envelope ID: 7AEE5586-6246-45FB-A4D6-FE7FEE09CDEB

It is further agreed that if any claims are filed and paid, and/or a request for a refund of premium is made and/or received by IWU, IWU will notify Randy promptly and will promptly transfer 50% of any and all claims payments resulting therefrom and/or return of risk-adjusted premiums to PC.

The parties acknowledge that there is no guarantee or warranty that there will be any claims payments received, nor that there is a guarantee of any risk adjusted return of premium benefit, as future claims experience are unknown and, therefore, uncertain. As a result, IWU is not making any representations about the Program, nor any benefits that may or may not be received from the Program over time.

4.      <u>Miscellaneous</u>.

(a)      <u>Survival</u>.   Unless otherwise expressly set forth in this Agreement, the representations, warranties and covenants contained herein or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Buyer's purchase of the Interest and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of the Buyer, the PC, or the Company.

(b)      <u>Governing Law; WAIVER OF JURY TRIAL</u>.   This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of Utah, without regard to the conflicts of law provisions of the State of Utah or of any other state.   EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT.

(c)      <u>Assignment</u>.   The rights, interests or obligations hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by either party without the prior written consent of the other party.

(d)      <u>Delays or Omissions</u>.   No delay or omission to exercise any right, power or remedy accruing to either party to this Agreement, upon any breach or default of the other party under this Agreement, shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or a waiver of or acquiescence in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.   All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

(e)      <u>Specific Performance</u>.   The Buyer and the Company each agrees that remedies at law may be inadequate to protect the PC against a breach or threatened breach of this Agreement, and further agrees in advance that the PC shall be entitled to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and conditions hereof, in addition to any other remedy to which the PC is entitled at law or in equity.

(f)      <u>Severability</u>.   If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith.   In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then such provision(s) shall be excluded from this Agreement and the balance of the

5/4/2021

Agreement shall be interpreted as if such provision(s) were so excluded and shall be enforceable in accordance with its terms.

(g)  Counterparts; Signatures.  This Agreement may be executed and delivered by facsimile or electronic signature and in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(h)  Notices.  All notices required or permitted hereunder shall be in writing and delivered to each party at such party's respective address, and shall be deemed effectively given, as set forth in the Purchase Agreement.

(i)  Amendments and Waivers.  Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of each of the undersigned.

(j)  Entire Agreement.  Notwithstanding any integration provisions in any other Transaction Document, this Agreement is not superseded by any such Transaction Documents, but rather this Agreement constitutes and contains the entire agreement between the parties hereto and supersedes any and all prior agreements, negotiations, correspondence, understandings and communications among the parties, whether written or oral, respecting the subject matter hereof.  In all events, the terms and provisions of this Agreement and the Transaction Documents shall be enforceable by the PC notwithstanding any conflicting term or provision set forth in any of the Transaction Documents and regardless of whether the respective Transaction Document was executed before, simultaneously with or after this Agreement.  In the event of any conflict between any term or provision of this Agreement and any term or provision set forth in any other Transaction Document, such conflict shall not derogate from the PC's rights hereunder or under any other Transaction Document and, notwithstanding any such conflict, the PC shall be entitled to the benefits of this Agreement and the other Transaction Documents to the fullest extent provided hereunder and thereunder.  Notwithstanding the foregoing, if the Buyer, the Company, and the PC expressly agree in writing that a provision in a Transaction Document specifically overrides any provision of this Agreement (and such agreement expressly references this Agreement by name), such provision in the applicable Transaction Document shall prevail.

[*Signature page follows*]

5/4/2021

Please confirm that the above correctly reflects our understanding and agreement with respect to the foregoing matters by signing the enclosed copy of this Agreement and returning such copy to the Company.

Integrated Holding Company, LLC

By: *SCOTT FROGLEY*                    5/4/2021
F2CCB29559CE400
Scott Frogley, Manager


Dr. Randy E. Woodward DC, PC

By: *Randy Woodward*                    5/4/2021
5E9AAE106B174CA
Randy E. Woodward, President

RJ&CS SC Holdings, LLC


By: *Regan Archibald*                    5/4/2021
2185010DB09B4A8
Regan Archibald, Manager


By: *Cade Archibald*                    5/4/2021
DEE6AF152F2F42C
Cade Archibald, Manager

# EXHIBIT A

See attached PDF labeled "information packet Reliant group pool"

5/4/2021